**AFFIRM in part; Reverse and Render in part, and Remand; Opinion filed October 7, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-10-00283-CV
_____

**MIRA MAR DEVELOPMENT CORPORATION, Appellant**

**V.**

**CITY OF COPPELL, TEXAS, Appellee**

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 07-11511-E**

# OPINION NUNC PRO TUNC

Before Justices Lang, Myers, and Murphy[1]
Opinion by Justice Myers

This case involves an appeal from a city council hearing to a district court pursuant to

Texas Local Government Code section 212.904(e). Mira Mar Development Corporation appeals

the district court's judgment in favor of City of Coppell, Texas on its claims seeking

compensation for exactions. Appellant brings nine issues asserting the trial court erred by

denying its motion for summary judgment and granting the City's motion for summary judgment

and for awarding appellant only $40,280.84. We affirm in part, reverse and render in part, and

reverse and remand in part for further proceedings.

---

[1] The Honorable Mary Murphy, Justice, participated in the submission of this cause and the issuance of this Court's original opinion on March 23, 2012. Justice Murphy resigned from the Court on June 7, 2013. Appellant filed its Unopposed Motion to Modify Judgment and Recall Mandate on September 23, 2013.

# BACKGROUND

In 2006, appellant purchased approximately 18.5 acres in Coppell, Texas, to develop a 29-lot residential subdivision called Alexander Court. In 2008, appellant sold the lots to David Weekley Homes, a home builder.

This lawsuit concerns appellant's conflicts with the City in obtaining approval of the development, including delays and changes to the development plan that increased appellant's costs and reduced the sale price of the lots. Appellant demanded the City compensate it for the increased costs and reduced sale price. Appellant sought a review of its grievances in a hearing before the City Council pursuant to section 212.904 of the Texas Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. § 212.904(b) (West 2008). The City Council approved procedures for the hearing, which did not permit appellant to cross-examine the City's witnesses or present rebuttal evidence. At the conclusion of the hearing, the City awarded appellant $21,709.84 for taking .147 acre of land for a roadway. The City credited $18,444 toward outstanding roadway-assessment fees appellant owed on the project, which left $3265.84 the City owed appellant. *See* TEX. LOC. GOV'T CODE ANN. § 395.023 (West 2005).

Appellant brought suit in district court appealing the City Council's decision pursuant to section 212.904(b) of the Local Government Code. Appellant also alleged violations of its substantive and procedural due process rights and that the City's actions constituted compensable exactions or takings under the federal and state constitutions. In its first motion for summary judgment, appellant contended the City's procedures for the hearing before the City Council denied it due process, and the trial court agreed. The trial court granted the motion for summary judgment and ordered the City Council to conduct another hearing under procedures that accorded appellant due process. The second hearing before the City Council took place over three days in March and April 2009. After the second hearing, the City issued findings of fact

and conclusions of law and awarded appellant an additional $28,230 in compensation consisting of $12,465 for sidewalk construction costs, $11,265 for park fees, and $4500 for an extra water tap. The City Council also awarded appellant $1800 for attorney's fees. This second hearing was recorded by a court reporter.

In its second motion for summary judgment, appellant argued it was entitled to compensation as a matter of law because the City failed to prove the exactions were roughly proportional to the projected impact of the development and because appellant established the amount of compensation to which it was entitled as a matter of law: $792,657 plus attorney's fees. Appellant also argued the City Council's new procedures were unconstitutional. The district court denied appellant's second motion for summary judgment and stated it would "review the record of the proceedings before the Coppell City Council to determine whether the decision of the City Council is supported by substantial evidence."

On September 21, 2009, the trial court held a hearing under the substantial evidence standard of review. On October 5, 2009, the court signed an order mostly affirming the City Council's findings of fact and conclusions of law as supported by substantial evidence, but the court awarded appellant an additional $8785 for the value of the land occupied by the sidewalk. The court also reversed the award of attorney's fees to appellant, stating in the order that appellant was not a prevailing party.

Appellant then filed its third motion for summary judgment and the City filed its only motion for summary judgment. In these motions, the parties argued they were entitled to judgment as a matter of law concerning whether the procedures in the City Council hearing provided appellant substantive and procedural due process and whether the City's requirements, fees, and delays in the development-approval process were compensable exactions. Appellant's motion sought compensation of $801,762 for the City's exactions, plus attorney's fees.

The trial court granted the City's motion, denied appellant's motion, and rendered judgment for appellant awarding it $40,280.84, consisting of the $31,495.84 awarded by the City and the $8785 awarded by the trial court for the land occupied by the sidewalk. The court denied appellant's request for attorney's fees.

## APPLICABLE LAW

### Takings

Article I, section 17 of the Texas Constitution prohibits the taking of private property for public use without adequate compensation. TEX. CONST. art. I, § 17; *see Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex. 1998). This provision and the Just Compensation Clause of the Fifth Amendment to the United States Constitution, applied to the individual states through the Fourteenth Amendment, were "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see* U.S. CONST. amends. V, XIV. Whether particular facts are sufficient to constitute a taking is a question of law. *Gen. Servs. v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).

Takings can be classified as either physical or regulatory. *Mayhew*, 964 S.W.2d at 933. A physical taking occurs when the government authorizes an unwarranted physical occupation of an individual's property. *Id.* A regulatory taking may occur when a government conditions the granting of a permit or some other type of government approval on an exaction from a landowner seeking that approval. *See Dolan v. City of Tigard*, 512 U.S. 374, 384–85 (1994); *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 634 (Tex. 2004). An exaction occurs if a governmental entity requires an action by a landowner as a condition to obtaining

government approval of a requested land development.[2]  *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 71 S.W.3d 18, 30 (Tex. App.—Fort Worth 2002), *aff'd*, *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620 (Tex. 2004); *City of Carrollton v. RIHR, Inc.*, 308 S.W.3d 444, 449 (Tex. App.—Dallas 2010, pet. denied).  At oral argument, appellant's counsel confirmed that all of appellant's takings claims were under the exaction theory.[3]

For an exaction to be compensable, it must be a cost that, in fairness and justice, should be borne by the public instead of the individual.  As the Texas Supreme Court observed, "The touchstone of the constitutional takings protections is that a few not be forced . . . '"to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."'"  *Stafford Estates*, 135 S.W.3d 620, 642 (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 835 n.4 (1987) (quoting *Armstrong*, 364 U.S. at 49)).  To apply this sense of "fairness and justice," the Texas Supreme Court has adopted a "rough proportionality" test to determine whether an exaction constitutes a compensable taking:

> [C]onditioning government approval of a development of property on some exaction is a compensable taking unless the condition (1) bears an essential nexus to the substantial advancement of some legitimate government interest and (2) is roughly proportional to the projected impact of the proposed development.

*Stafford Estates*, 135 S.W.3d at 634; *see Dolan*, 512 U.S. at 391; *Nollan*, 483 U.S. at 837.  Under this test, the government must make an "individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."  *Stafford Estates*, 135 S.W.3d at 633 (citing *Dolan*, 512 U.S. at 391).  Thus, after the plaintiff

---

[2] The Houston (14th District) Court of Appeals has defined a land-use exaction as occurring "when the government requires an owner to give up his right to just compensation for property taken in exchange for a discretionary benefit conferred by the government."  *City of Houston v. Maguire Oil Co.*, 342 S.W.3d 726, 736 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Lingle v. Chevron U.S.A., Inc.* 544 U.S. 528, 548 (2005)); *see also Dolan*, 512 U.S. at 385 ("[T]he government may not require a person to give up a constitutional right―here the right to receive just compensation when property is taken for a public use―in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property.").

[3] In the discussion below, we conclude that some of appellant's allegations are not exactions.  Whether those allegations may constitute another type of regulatory taking is not before us.

proves an exaction, the burden of proof shifts to the government to prove the exaction imposed meets the test. *See id.* at 643. The government's proof of rough proportionality of the impact must be more than bare conclusions; the government is "required to measure that impact in a meaningful, though not precisely mathematical, way, and must show how the impact, thus measured, is roughly proportional in nature and extent to the required improvements." *Id.* at 644.

### Summary Judgment

The standard for reviewing a traditional summary judgment is well established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon*, 690 S.W.2d at 549; *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Guynes v. Galveston Cnty.*, 861 S.W.2d 861, 862 (Tex. 1993); *Howard v. INA Cnty. Mut. Ins. Co.*, 933 S.W.2d 212, 216 (Tex. App.—Dallas 1996, writ denied). Neither party can prevail because of the other's failure to discharge its burden. *Howard*, 933 S.W.2d at 216. When both parties move for summary judgment, we consider all the evidence accompanying both motions in determining whether to

grant either party's motion. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). When the trial court grants one motion and denies the other, the reviewing court should determine all questions presented. *Id.* The reviewing court should render the judgment that the trial court should have rendered. *Id.* When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm the summary judgment if any of the summary judgment grounds are meritorious. *Id.*

### Summary Judgment Evidence

In the third issue, appellant contends the trial court erred by overruling its objections to the City's summary judgment evidence. Appellant objected to twenty-two of the exhibits attached to the City's motion for motion for summary judgment and to the transcript of the second City Council hearing. Appellant asserts these items were inadmissible because they were pleadings, unauthenticated, hearsay, or "not summary judgment evidence."

The admission and exclusion of evidence is committed to the trial court's discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Costilla v. Crown Equip. Co.*, 148 S.W.3d 736, 738 (Tex. App.—Dallas 2004, no pet.). If we concluded the court erred by overruling appellant's objections to these items, we could not reverse unless we also concluded the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1). It is the appellant's burden to show harm from an erroneous evidentiary ruling. *In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003); *see also City of Brownsville*, 897 S.W.2d at 753–54 ("A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted."). On appeal, appellant does not explain how the allegedly improper exhibits affected the case other than to state generally that the City's summary judgment is unsupported by "sufficient" evidence. Accordingly, we conclude appellant has failed to meet its burden of showing harm.

Appellant also asserts the testimony of the City's expert witness, Ken Griffin, must be struck because "it" was not disclosed. Appellant cites no authority in support of this argument and fails to analyze the record relating to the testimony. Accordingly, appellant has presented nothing for our review. *See* TEX. R. APP. P. 38.1(i); *In re B.A.B.*, 124 S.W.3d 417, 420 (Tex. App.—Dallas 2004, no pet.). Similarly, appellant has not met its burden of showing harm. *See In re M.S.*, 115 S.W.3d at 538.

Appellant also objected to the trial court overruling its objections to the City's arguments based on allegations the City neither pleaded nor disclosed in discovery. With one exception, as discussed below, neither appellant's brief nor its objection before the trial court identified the affirmative defenses and arguments that were not pleaded nor disclosed. Accordingly, those objections are waived for lack of a specific objection before the trial court and for insufficient briefing on appeal. *See* TEX. R. APP. P. 33.1; 38.1(i).

Appellant did object in the trial court "to Coppell's legal arguments that a condition precedent was not performed by Mira Mar." That objection concerned appellant's request for roadway and water and sewer "impact" fees under chapter 395 of the Local Government Code. Appellant argues the City did not plead or disclose in discovery appellant's failure to perform a condition precedent. The City asserted appellant did not timely contest the impact fees under chapter 395 of the Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. § 212.904(f); *id.* § 395.077(a), (b) (West 2005). The City also moved for summary judgment and opposed appellant's motion for summary judgment on alternate grounds discussed below. We resolve the issue of the impact fees on those alternate grounds. Accordingly, any error by the trial court in overruling appellant's objection concerning the condition precedent did not probably cause the rendition of an improper judgment and is not reversible. TEX. R. APP. P. 44.1(a)(1).

We overrule appellant's third issue.

## Exactions and Rough Proportionality

In the first two issues, appellant contends the trial court erred by granting the City's motion for summary judgment and by denying appellant's third motion for summary judgment[4] because the City's requirements were exactions and the City did not establish, as a matter of law, that the alleged exactions were roughly proportional to the projected impact of the development. Appellant also makes other objections to some of the alleged exactions. To resolve these issues, we must first determine whether each requirement was an exaction and, if so, whether the City established (1) an essential nexus to the substantial advancement of a legitimate government interest and (2) the rough proportionality to the projected impact of the development. *Stafford Estates*, 135 S.W.3d at 634.

## Rolled Curbs

Appellant argues the City required straight curbs in the subdivision instead of the rolled curbs appellant planned to use. Appellant's president, John Hawkins, stated in his affidavit that appellant proposed using rolled curbs in Alexander Court on "a street with a twenty-seven-foot width."[5] He stated that the City's ordinance required a street width of at least twenty-seven feet. At the City Council hearing, Hawkins stated that when appellant's contract with David Weekley Homes was renegotiated,[6] the City's requirement that straight curbs be used instead of rolled curbs resulted in a $40,000 reduction in the price of all the lots because the straight curbs would

---

[4] Unless otherwise noted, references to "appellant's motion for summary judgment" are to appellant's third motion for summary judgment.

[5] Hawkins then stated, "This exceeded the minimum 27-foot width mandated by the Coppell engineer, as measured 'gutter-to-gutter' described in the Coppell ordinance." Appellant does not explain how the 27-foot street width "exceeded" the requirement that the streets be 27 feet wide. The parties do not cite, nor have we discovered, the ordinance requiring a 27-foot width in the voluminous record on appeal. The City's Subdivision Ordinance in the record before us required a street width of 28 feet "b-b," which appears to mean between the back of the curbs. *See* Coppell, Tex., Ordinance 94643, Subdivision Regulations App. C, § VII (Apr. 12, 1994).

[6] The testimony at the City Council hearing showed the original contract between appellant and David Weekley Homes was for 26 lots. When the floodplain study showed less of the property was in the floodplain than appellant predicted, appellant changed the design of the subdivision to 29 lots. Appellant and David Weekley Homes renegotiated the contract to account for the increase in lots as well as other changes, including straight curbs instead of rolled curbs.

cost David Weekley Homes approximately $1300 to $1400 per lot more than the rolled curbs would have cost.

Hawkins told the City Council he designed the streets in the subdivision to be identical in width and curb style to those in The Springs subdivision on the other side of the road. However, when he submitted the plat, the City told him the streets had to conform to the City's regulation or "detail." According to testimony at the City Council hearing, the detail showed a street design with a minimum width of twenty-seven feet between the gutters of straight curbs. Hawkins testified that the City's regulations did not address rolled curbs.

Ken Griffin, the City Engineer, testified at the City Council hearing that the City required streets to be at least twenty-eight feet measured from the back of one curb to the back of the opposite curb and to have a minimum width between the gutters or face-to-face of twenty-seven feet. Griffin stated that although appellant's proposed streets were twenty-eight feet measured between the back of the curbs as required by the City's ordinance, the streets were only twenty-four feet between the gutters. Griffin agreed that The Springs subdivision had streets of the same dimensions as appellant proposed, but he stated that subdivision was built in the mid-1990s and the rolled curbs there were a test. Griffin testified the City quickly learned that the streets were too narrow. The narrower streets limited maneuverability when cars were parked on both sides of the street and created a public safety issue. Griffin testified he told appellant's engineer that the streets with rolled curbs would be acceptable if they were at least twenty-seven feet from gutter to gutter, which would require a distance of thirty-one feet between the back of the curbs. Instead of redesigning the width of the streets, appellant changed the plat to use straight curbs keeping the twenty-eight-foot distance between the back of the curbs.

Although there is a fact issue regarding the width of the streets—Hawkins testified the proposed streets were twenty-seven feet wide between the gutters and Griffin testified they were

only twenty-four feet wide—that fact question is not material because the parties agreed the proposed streets were the same design as in The Springs subdivision. The record conclusively shows the City made an individualized determination that the proposed streets, which were the same design as those in The Springs subdivision, were too narrow, and its requirement that the streets in Alexander Court be wider if they were to have rolled curbs was necessary for the public safety. Thus, the street-width requirement the City imposed on appellant bore "an essential nexus to the advancement of" the legitimate government interest of public safety. The street-width requirement was limited to the streets in the subdivision and did not require the improvement of any property outside the subdivision. Thus, the requirement was roughly proportional to the projected "impact" of the development. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion regarding the rolled curbs.

**Extra Drainage Outlets**

The City required appellant to add two extra drainage outlets to obtain approval of the subdivision. Hawkins testified the extra outlets cost appellant $14,020.

The evidence shows the City required the extra outlets be installed where two streets in the subdivision converged at almost ninety degrees to form a "T." As originally proposed, there was no drainage outlet in the vicinity of the T intersection. The City's regulations governing design criteria and standards for storm sewers and drainage required a subdivision's engineering design to conform to the City of Dallas Drainage Design Manual which, Griffin testified, required outlets be placed upstream to T intersections. Griffin testified he required the two extra outlets because of the potential for flooding caused by the street forming the pillar of the T sloping downhill toward the street forming the crossbar of the T. Griffin explained his reasons for requiring the inlets as follows:

–11–

A couple of things happen when you go to T intersections. Water goes down at a high rate of speed on a sloped street, it hits the intersecting street. At times it will turn, at times it won't. In this particular case because of the layout of the lots, there are going to be driveways very near this intersection. Driveways have . . . a habit of sucking water out of the street, taking it to and through the garage and sometimes through the house.

Based on twenty-seven years of practice and what, twenty-two of those as a licensed engineer, it's always good judgment, and that's why Dallas put it in their drainage design manual, that inlets should be placed upstream to T intersections to collect the water before it gets into the intersection to create a potential problem.

Griffin testified that in deciding to require the additional drainage outlets, he considered the layout of the streets and the potential for flooding on the lots at the intersection.

This uncontroverted evidence shows Griffin, on behalf of the City, made an individualized determination based on the unique conditions of the development that the additional drainage outlets were necessary to prevent flooding of some of the lots in the subdivision. Prevention of flooding is a legitimate government interest. Thus, the evidence establishes that the condition for approval of the plat, the additional drainage outlets, bore an essential nexus to the substantial advancement of a legitimate government interest. The evidence also shows that the additional outlets would affect only the subdivision and not any other property and were required because of the subdivision's design. Accordingly, the condition was roughly proportionate to the projected impact of the development. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion concerning the additional drainage outlets.

**Offsite Sidewalk**

The City required appellant to build a sidewalk outside the subdivision but on property owned by appellant. The dispute over this item concerns only the extent of appellant's compensation. The City Council concluded appellant was entitled to compensation for the cost of building the sidewalk, $12,465, but not for the value of the land occupied by the sidewalk.

–12–

The trial court, however, concluded appellant was entitled to compensation for the value of the land and awarded appellant $8785, making the total compensation to appellant for the sidewalk $21,250. Appellant moved for summary judgment asserting it was entitled to $9000 for the value of the property for total compensation of $21,465. The City argues the trial court awarded $8785 for total compensation of $21,250 instead of $9000 for total compensation of $21,465 because appellant's demand letters to the City for compensation prior to the City Council hearing requested $21,250. Appellant's response on appeal to the City's argument is, "Mira Mar is entitled to the full amount—$21,465."

The only evidence of the value of the property is Hawkins's testimony at the City Council hearing and in his affidavit in support of appellant's motion for summary judgment that the property is worth $9000. As appellant's president, Hawkins is presumed to have had knowledge of the property's fair market value. *See Reid Rd. Mun. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 849 (Tex. 2011); *Corniello v. State Bank & Trust, Dall.*, 344 S.W.3d 601, 607 (Tex. App.—Dallas 2011, no pet.). We conclude the trial court erred by granting the City's motion for summary judgment and denying appellant's motion on the issue of the offsite sidewalk. We render judgment that appellant is entitled to total compensation of $21,465 (an additional $215 over what the trial court awarded) for the value of the property under the sidewalk and the cost to build the sidewalk.

### Over-Fill for Pad Sites

The City required appellant to raise the elevation of the "pad site" or building location on two of the lots as a condition for approval of the subdivision. Hawkins testified that the City's ordinance required the pad sites be one foot above the 100-year flood plain, and the lots as proposed complied with that requirement. However, Griffin, as the City Engineer, required appellant to raise the level of the two lots at the end of the T intersection to one foot above the

–13–

curb height. Appellant resubmitted the plans with the pad sites raised to the new level. Hawkins testified that the additional material and labor to raise the pad sites cost appellant $7600.

Griffin testified he required the additional height of the pad sites to protect the future homeowners of those lots from flooding caused by the slope of the street leading to the lots. Griffin agreed that the pad heights as originally submitted complied with the City's minimum requirements and the federal regulations. Griffin based his requirement that the pads be raised on his engineering judgment, which was based on his experience and education and not on any calculations. Griffin stated that the law applicable to engineers permits him to impose requirements exceeding the City's minimum requirements when, in his engineering judgment, the greater requirements are necessary to protect the health, safety, property, and welfare of the public. Griffin's sole concern in requiring the raised pad elevation was that the two houses not flood during a storm. Griffin testified that when there are lots at a T intersection, "you try to elevate one foot above top of curb and you try to provide positive drainage between the two houses so if water does go above the top of the curb, it can flow between the houses."

This evidence shows the City's requirement of one foot above the 100-year flood level was a minimum requirement. As City Engineer, Griffin had authority to impose greater requirements when necessary to protect the public health, safety, property, and welfare. Griffin required the additional height because the pad sites were at the bottom of a down slope at a T intersection. This requirement bore an essential nexus to the substantial advancement of a legitimate government interest, flood prevention. The requirement was a result of the design of the subdivision, and its impact was limited to the two lots, so the requirement was roughly proportional to the projected impact of the proposed development. Moreover, as the requirement benefitted only the two lots and did not benefit the City, this requirement was not a "public burden[] which in all fairness and justice, should be borne by the public as a whole." We

–14–

conclude the City's requirement that the height of the pad sites be raised above the minimum requirements set out in the City's ordinances was not a compensable exaction, and the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion on this item.

**Additional Storm Drain Construction and Riprap**

Hawkins testified that the City required appellant to install an additional storm drain to service the extra drainage outlets at the T intersection. Appellant originally planned to run a drainage pipe from the additional outlets at the street to a floodplain behind the lots. Hawkins testified that appellant planned to end the drainage pipe 120 feet from a creek behind the lots. Hawkins stated that the City required appellant to extend the drainage pipe 120 feet from the floodplain to the creek and to support the additional drainage pipe on a pier. The additional drainage pipe, riprap, and pier cost appellant $24,625.

Griffin testified the riprap was necessary to prevent erosion and the pier would prevent the headwall at the creek bed from collapsing. He also testified the City required appellant to extend the drainage pipe 20 feet, not 120 feet. Griffin stated the edge of the floodplain was 120 feet from the creek, and appellant's initial plans showed the drainage pipe extending 100 feet into the floodplain.

In its motion for summary judgment, the City asserted Griffin testified the drainage pipe extension was necessary to prevent erosion. However, Griffin did not so testify. During the City Council hearing, the City's attorney asked Griffin why the extension to the creek was necessary. Instead of answering the question, Griffin stated he asked appellant to extend the pipe twenty feet to the creek and to place it on piers. Griffin then explained the need for the piers—to prevent the pipe from collapsing the ground at the creek—but he never explained the need for the extension of the pipe to the creek. Griffin testified that storm sewer lines terminating in a

–15–

floodplain are "a commonly used engineering factor" and do not violate the City's ordinances. In response to a question from a City Councilman, Griffin stated that he made his decision in his role as City Engineer to protect property owners from flooding. However, he never testified that the drainpipe extension was necessary to prevent flooding. He also testified that in his judgment, "this storm sewer [was] specifically designed and built for this subdivision and the impact this subdivision has in the [C]ity." This bare conclusion provides no evidence of the reason and necessity for the requirement that the drainpipe be extended to the creek. *Cf. Stafford Estates*, 135 S.W.3d at 644–45 (discussing insufficiency of town's assertions of rough proportionality).

With no evidence of the reason for the extension, the City did not conclusively establish that the extension of the drainage pipe to the creek bed was an essential nexus of a legitimate government interest and that the extension was roughly proportionate to the impact of the project. Accordingly, we conclude the trial court erred by granting the City's motion for summary judgment on this item.

Appellant's motion for summary judgment asserted the City required the additional storm drain, drainage pipe extension, riprap, and piers as a condition for approval of the subdivision. Appellant met its summary judgment burden by conclusively proving that the City imposed an exaction. The burden then shifted to the City, which failed to raise a fact question on the "essential-nexus/rough-proportionality" test. *See Stafford Estates*, 135 S.W.3d at 643. Griffin's testimony created a fact issue concerning the extent of appellant's damages, namely whether the drainage pipe had to be extended 20 feet or 120 feet. Accordingly, we conclude the trial court did not err by denying appellant's motion for summary judgment on this item.

**Extra Sewer Manhole**

Hawkins testified the City required appellant to add a sewer manhole before the City would approve the property development. Appellant's utilities contractor charged appellant $3500 for the materials and labor to add the manhole.

Griffin testified a City ordinance required there be a manhole every 500 feet of sewer line. The sewer line at issue was either 570 feet or 581 feet, so the City's ordinance required an additional manhole. Griffin explained the 500-foot rule was because the City's camera for viewing the condition of the sewer line and the City's equipment for clearing sewer blockages would reach only 500 feet. This sewer line also had four curves in it, which made it more difficult for the City's equipment to clear blockages. If there were a blockage beyond the reach of the City's equipment, the City would be required to cut open the sewer line though the street, which would impose additional expense on the City and interrupt sewer service for a portion of the community. The sewer line at issue serviced only the residents of Alexander Court.

Griffin's testimony established the City made an individualized determination of the need for the extra manhole. His testimony proved the requirement of the extra manhole bore an essential nexus to the advancement of a legitimate government interest, the efficiency of the sewage drainage system. Because the need for the extra manhole was created by the design of the subdivision and its beneficial effect was confined to the subdivision, the requirement of an extra manhole was roughly proportionate to the projected impact of the development. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion on this item.

**Waterline Concrete Caps**

To bring water into the subdivision, appellant had to extend waterlines under the road outside the subdivision. The City permitted appellant to dig trenches across the road, lay the

waterlines, cover them up, and re-pave those areas. The materials used to cover the waterlines and on which the asphalt paving was laid were the waterline caps. Appellant wanted to use compacted fill dirt for the caps. The City required that concrete be used. Hawkins testified the concrete caps were not necessary because they would be destroyed when the road was repaved. He stated that appellant had increased costs of $3000 due to the concrete caps.

Griffin testified the road was subject to caving where lines ran under it with fill dirt supporting the road instead of concrete caps. Griffin testified that concrete caps were necessary for the road to be able to sustain traffic on it. If fill dirt caps had been used and the road had failed before it was repaved, the City would have had to repair the road, incurring expenses.

Griffin's testimony established he made an individualized determination concerning the need for the concrete caps based on the unique characteristics of the road and the utilities appellant placed under the road. The requirement of concrete caps bore an essential nexus to the advancement of a legitimate government interest, safe and efficient roadways. The requirement of the concrete caps was the result of extending waterlines into Alexander Court, which benefitted only the residents of the subdivision. Accordingly, the requirement of concrete water caps was roughly proportionate to the projected impact of the development. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion on this item.

## Screen Wall Exterior Columns

The City's ordinances required appellant to build a screen wall around the subdivision with columns on the exterior portion of the wall and to have landscaping near the wall.[7] These requirements were a condition for approval of the subdivision. The columns and the landscaping

---

[7] Appellant argued the screen wall landscaping exaction as items (8) and (25) of its brief. We discuss them together except for the portions of item (25) concerning the roadway cleanup, which is discussed below.

were on appellant's property. Appellant argues the columns and landscaping were compensable exactions because they were aesthetic and not structural or otherwise functional. Hawkins testified that the columns and landscaping cost appellant $18,040.

Maintaining aesthetic values is a legitimate government interest. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."). Appellant's brief does not explain why the City's requirements of columns and landscaping fail the essential-nexus/rough-proportionality test. Appellant does not dispute that the columns and landscaping enhanced the visual aesthetics of the subdivision. Because the columns and landscaping were on appellant's property and there was no required improvement of the City's or third party's property, the requirement of the columns and landscaping was roughly proportional to the projected impact of the development. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion on this item.

**Retaining Walls and Four-to-One Slope**

Appellant asserts the City required appellant to build certain retaining walls and to change slopes from three-to-one to four-to-one and that the retaining walls and the change of slope were conditions for approval of the subdivision. Hawkins testified that three-to-one slopes are "acceptable by the FHA and its standards" and that no City ordinance required a four-to-one slope. He also testified that although David Weekley Homes required some retaining walls, the City required six other retaining walls. According to Hawkins, no City ordinance required the retaining walls. Hawkins testified that the City-required retaining walls and four-to-one slope cost appellant $55,517.

Griffin testified that the City did not mandate retaining walls as a condition for approval of the subdivision, and Griffin told appellant's engineer that the retaining walls were not

required. According to Griffin, the plans the City received from appellant's engineer included retaining walls. Griffin marked on the plans that some of the retaining walls should be joined, but Griffin testified the joining of the walls was only a suggestion, not a requirement. Griffin stated that the project was approved without the City requiring any retaining walls on the lots, and David Weekley Homes later requested that appellant build the retaining walls. Griffin testified that the four-to-one slope requirement was an alternative to building retaining walls. Griffin testified that appellant built the four-to-one slopes the City required and built the retaining walls, which the City did not require. Hawkins sent several letters to Griffin complaining about what he believed to be a requirement that appellant build the retaining walls, but Griffin never responded to these letters.

The City's motion for summary judgment and its response to appellant's motion for summary judgment asserted there was no exaction as to the retaining walls because the City did not require the retaining walls. However, Hawkins's testimony that the retaining walls were required as a condition for approval of the subdivision created a genuine issue of material fact concerning whether the retaining walls were an exaction. The City's motion for summary judgment did not address the essential-nexus/rough-proportionality test concerning the retaining walls. Accordingly, the trial court erred by granting the City's motion for summary judgment on the retaining walls. Because of the fact issue on whether the retaining walls were an exaction, the trial court did not err by denying appellant's motion for summary judgment on the retaining walls.

Appellant proved the requirement of four-to-one slopes was an exaction. The City's motion for summary judgment and response to appellant's motion for summary judgment asserted the slope requirements would further erosion control and improve drainage. However, the City presented no evidence that the four-to-one slopes would control erosion and improve

drainage in the subdivision better than appellant's proposed three-to-one slopes.[8]  Thus, the City presented no evidence that the four-to-one slope requirement was roughly proportional to the projected impact of the subdivision.  We conclude the trial court did not err by denying the City's motion for summary judgment on the four-to-one slope requirement.

Appellant conclusively proved the four-to-one slope requirement was an exaction and the City failed to raise a genuine issue of material fact on the essential-nexus/rough-proportionality test, but appellant did not separate its damages for the slope requirement from those for the retaining walls.  Thus, a genuine issue of material fact remains as to the amount, if any, of appellant's compensation for the added expense of the four-to-one slope requirement.  We conclude the trial court did not err by denying appellant's motion for summary judgment on this item.

### Redundant Excavation in Floodplain

During the initial work on the subdivision, most, if not all, of the property was classified as floodplain under the existing records of the Federal Emergency Management Association (FEMA).  Appellant, through the City, applied to FEMA for a revision in the floodplain maps.  While FEMA was reviewing the application, appellant planned to dig out the areas that would be the streets and use that dirt to build up the pad sites in areas then classified as floodplain.  The City's ordinances prohibited work in the floodplain without a permit.  Appellant asked the City for permission to use dirt from the streets to build the pads on the lots in the floodplain, but the City denied the request.  The City told appellant it could either wait to dig the streets until FEMA had approved the new floodplain map or it could dig the streets, store the dirt out of the

---

[8] The City Council's findings of fact and conclusions of law state the retaining walls were "for lateral soil support."  However, neither Griffin nor Hawkins testified to that being their purpose or that lateral soil support was necessary.  In its motion for summary judgment, the City asserted the four-to-one slope advanced the City's legitimate government interest "in furthering erosion control."  However, the record contains no evidence that the four-to-one slope would prevent soil erosion at all, much less prevent erosion better than appellant's proposed three-to-one slope.

–21–

floodplain, and then move it again once FEMA approved the new floodplain map. Hawkins testified that appellant could not afford the delay, so appellant had its contractors move the dirt twice. Hawkins testified the City's denial of appellant's permit to use the dirt in the floodplain increased its costs by $16,000. The City later granted appellant permission to work in the floodplain, but not until after appellant had dug the streets and stored the dirt.

In its motion for summary judgment, the City asserted that appellant's having to move the dirt twice was not an exaction. We agree. An exaction is a condition required for approval of a requested land development. Although the City required appellant to comply with its ordinance prohibiting work in the floodplain, that requirement was not a condition for approval of the subdivision. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion on this item.

### Floodplain Study Checking and Floodplain Delay

When appellant purchased the property, much of the property was designated as floodplain on existing maps. Appellant hired Nathan Maier to determine the current position of the floodplain. Maier's study showed the floodplain was nowhere near where FEMA's maps showed it and that most of the subdivision was out of the floodplain. Appellant had to apply to FEMA for a change in the floodplain designation. FEMA approves a change in the floodplain through a Letter of Map Revision. A developer's application for a map revision must first go to the local governmental entity, which submits it to FEMA.

The City received appellant's FEMA application on April 17, 2007. Before submitting appellant's application for map revision to FEMA, the City had it reviewed by an engineering firm with expertise in floodplain study, Kimley Horn & Associates, which charged the City $2500 to review the application. The City had earlier told appellant the fee for reviewing the floodplain application was $2000, so the City charged appellant only $2000 for the review.

–22–

Hawkins testified Griffin told him the City would not submit the application to FEMA if appellant did not pay the fee. The City submitted the application to FEMA on July 10, 2007. Hawkins testified the nearly three-month delay for review of the floodplain application cost appellant $16,000. Hawkins testified that no City ordinance required the application be reviewed by an engineering firm before submitting the application to FEMA. Kimley Horn found some minor technical deficiencies in the application, but it eventually approved the application. The City then submitted the application to FEMA.

Griffin testified the City has all floodplain map-revision applications reviewed by Kimley Horn and charges Kimley Horn's fee to the developer. The City has the floodplain studies reviewed to protect the City's interest in preventing flooding of the residences in the subdivision. Griffin testified that review of the floodplain study is especially important when the study shows a significant change in the floodplain. The change in the floodplain in this case was significant. Erroneous determination of the floodplain could result in flooding and property damage.

Appellant asserts the City's threat not to submit the map-revision application to FEMA unless appellant paid the $2000 fee was an exaction. We agree. Although payment of the fee was not an express condition for approval of the subdivision, the failure to submit the application to FEMA would have resulted in the denial of approval for the subdivision because appellant could not build in a FEMA-designated floodplain.

Although the position of the floodplain was ultimately determined by FEMA, the City still had an interest in the accurate determination of the floodplain. As it is the City and not the developer that files the application with FEMA, the City was entitled to review the accuracy of the application before submitting it to FEMA. Any inaccuracies in the location leading to flooding of the lots would be the long-term concern of the City, not appellant, which had already agreed to sell the lots to David Weekley Homes. The summary judgment evidence shows

–23–

Kimley Horn's review of the map-revision application before the City's submission of the application to FEMA bore an essential nexus to the substantial advancement of the legitimate government interest of flood prevention. The $2000 fee appellant paid to the City was less than Kimley Horn's fee paid by the City. Thus, the $2000 fee did not exceed what was roughly proportional to the subdivision's projected impact.

The City's $2000 fee for review of appellant's floodplain study was not a compensable exaction. Accordingly, appellant is not entitled to compensation for the $2000 fee or for the delay from Kimley Horn's review of the floodplain study. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion on these items.

**Park Fees**

The City conditioned approval of the subdivision on appellant's paying park fees of $37,265. During the first City Council hearing, which the trial court set aside, Hawkins testified he considered the roughly proportionate amount of park fees to be $26,000. At the second City Council hearing, Hawkins testified appellant sought compensation for all the park fees. The City Council awarded appellant $11,265, which was the difference between the park fees appellant paid and those Hawkins had agreed at the first hearing were roughly proportionate.

The City's ordinance required residential developments to dedicate one acre of land per 100 dwelling units in the development for use as a neighborhood public park. Coppell, Tex., Ordinance 94643, Subdivision Regulations App. C, § VII(B)(1) (Apr. 12, 1994). Because development of a public park of less than one acre is impractical, the ordinance required a development with fewer than 100 residential units to make a payment in lieu of land of $1285 per dwelling unit. *See id.* § VII(B)(2), (D)(3). Alexander Court had twenty-nine dwelling units; under the ordinance, it was required to pay a fee of $37,265. The City's reduction of the fees to

–24–

$26,000 made the fees per lot $896.55, a reduction of about thirty percent. The ordinance required the park fees "be used only for acquisition or improvement of a neighborhood park located within the same zone as the development." *Id.* § VII(D)(3).

The City proved that the fees originally assessed were based on the individual characteristics of the subdivision, namely, how many dwelling units were within the subdivision. Hawkins testified there would probably be three to four people in each unit, making the population of the subdivision about ninety inhabitants. Brad Reid, the City's director of parks and recreation, testified the subdivision's ninety inhabitants would increase the burden on the City's park and recreation facilities. Reid explained that the money would "go for development of playgrounds, the structures, benches, more social type areas developing in the parks." The City presented no evidence of how the fee per dwelling was calculated or how the fee was roughly proportionate to the City's parks and recreation costs.

Appellant met its burden of proof by establishing the park fees were an exaction. Public parks and recreation spaces are a legitimate government interest, and the park fees appellant paid bore an essential nexus to the substantial advancement of that interest. However, the City failed to prove that the original fee of $1285 or the reduced fee of $896.55 per dwelling was roughly proportionate to the projected impact of one dwelling's residents on the park system. We conclude the trial court erred by granting the City's motion for summary judgment on this item.

Reid's testimony that the ninety inhabitants of Alexander Court would increase the park system's burdens raised a genuine issue of material fact that some part of the fees would be roughly proportionate to the development's impact on the park system. Accordingly, we conclude the trial court did not err by denying appellant's motion for summary judgment on this item.

## Tree Retribution Fees

The City required appellant to pay "tree retribution fees" (called "tree mitigation fees" by the parties) of $34,500 before the City would approve the subdivision.

The City's tree preservation ordinance sought to protect trees and promote urban forestation for the many benefits trees provide. The preamble of the ordinance listed many benefits of trees, including shade and cooling, reduction of noise and glare, protection of soils, providing of ecosystems, and increasing property values.[9] Coppell, Tex., Ordinance 91500-A-203 (Dec. 8, 1998). Under the City's tree ordinance, a property developer must receive permission to remove a tree with a trunk diameter of six inches or greater. *Id.* §§ 34-2-7(A), 34-2-11(A). The developer must then pay the City a "retribution" fee of $100 per inch of trunk diameter to remove these trees. The developer receives a landscaping credit for each tree planted and a preservation credit for trees remaining on the property. *Id.* § 34-2-13(A)(1), (2). The retribution fees are used (1) for planting trees on public property, (2) for purchasing wooded natural areas "to preserve these highly-sensitive environmental areas for public protection and

---

[9] The ordinance provides,

> **WHEREAS**, trees are a valuable amenity to the urban environment, providing shade, cooling of air, and windbreaks, thereby reducing the requirements for air conditioning, heating and watering thus reducing the use of limited and costly resources; and
>
> **WHEREAS**, trees purify the air we breathe by filtering pollutants and dust while restoring oxygen to the atmosphere; and
>
> **WHEREAS**, trees provide open spaces, reduction in noise levels and glare, and break the monotony of urbanized development; and
>
> **WHEREAS**, trees create local ecosystems that provide habitat for animals, birds, and plants that would otherwise be absent from urban areas; and
>
> **WHEREAS**, trees protect land and structures by providing soil stability and reducing storm water run-off thus minimizing flood damage and reducing the need for additional storage facilities; and
>
> **WHEREAS**, trees are known to add value to residential and commercial property, thus increasing tax revenues by attracting new business, industry, and residents to the City, and
>
> **WHEREAS**, trees should be protected for the education and enjoyment of future generations since large, mature trees, if destroyed, can be replaced only after generations, if at all . . . .

Coppell, Tex., Ordinance 91500-A-203 (Dec. 8, 1998).

passive recreational enjoyment," and (3) for "[e]ducational projects, such as construction of outdoor learning centers or classroom/group tours led by foresters or park staff." *Id.* § 34-2-12(D).

Appellant established the fees were an exaction, and the burden shifted to the City to meet the essential-nexus/rough-proportionality test. The City asserts it proved the rough proportionality of the fees by proving the fees were based on the trees appellant removed from the property.

The preservation and expansion of public wooded areas and the educational programs are legitimate government interests, and the fees to promote the City's reforestation programs bear an essential nexus to the substantial advancement of those interests. The "impact" of the development was the need created by appellant's removal of trees on its property for the City to plant trees on public property, to purchase wooded property, and to conduct educational programs. However, the summary judgment evidence does not explain how the removal of trees on appellant's private property created such a need that did not exist before the trees were removed. The City did not show that the removal of trees in the development would harm the air quality, increase noise and glare, remove ecosystems, bring down property values, or reduce the other benefits of trees described in the ordinance. Unlike the park fees, where the City presented some evidence that the development would place increased burdens on the City's park system, the City presented no evidence that the removal of trees from appellant's private property would increase the need for trees on public property or for the other programs beyond what already existed before appellant removed the trees on its property. With no evidence of any projected impact caused by the removal of trees during the development, the City did not raise a genuine issue of material fact that any amount of tree retribution fees would be roughly proportional.

–27–

We conclude the trial court erred by granting the City's motion for summary judgment and denying appellant's motion on this item, and we render judgment that appellant recover the $34,500 in tree retribution fees.

## Roadway and Water and Sewer Impact Fees

The City conditioned approval of the subdivision on appellant's payment of roadway impact fees of $18,444. The City deducted the fees from the $21,709.84 it owed appellant as compensation for taking a .147 acre tract for a roadway. The City also assessed water and sewer impact fees of $100,527.

The roadway impact fees were an exaction because the City conditioned approval of the subdivision on appellant's payment of them. However, the record shows the water and sewer impact fees were not an exaction against appellant. The water and sewer fees are paid when the building permit is issued and not when the plat is filed. *See* TEX. LOC. GOV'T CODE ANN. § 395.016(d)(1) (West 2005). Hawkins testified the fees would be paid to the City by David Weekley Homes, not by appellant. Appellant argued it should be compensated for those fees because David Weekley Homes reduced the sales price of the lots by the amount of the water and sewer fees. However, because the City did not condition approval of anything applied for by appellant on payment of the water and sewer impact fees, those fees were not exactions against appellant.[10] Since the water and sewer fees were not exactions, the trial court did not err by denying appellant's motion for summary judgment as to those fees. The City did not move for summary judgment on the ground that the water and sewer fees were not exactions. Accordingly, we may not affirm the trial court's grant of the City's motion for summary

---

[10] Hawkins stated in his affidavit that the City "was paid $2,997 on July 31, 2008 a Water Impact Fee." The affidavit cited an attached list of "Development Fees" showing $2997 paid for a Water Impact Fee on July 31, 2008. However, Hawkins did not testify, and the cited exhibit does not show, that appellant paid the $2997 fee. Accordingly, this evidence does not raise a fact issue of whether the $2997 was an exaction from appellant.

–28–

judgment on that ground. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

Chapter 395 of the Local Government Code prohibits impact fees except as authorized by state law. TEX. LOC. GOV'T CODE ANN. § 395.011(a) (West 2005). Chapter 395 permits impact fees to pay the costs of constructing capital improvements. *Id.* § 395.012. The municipality determines the amount of the impact fees by preparing a "capital improvements plan." *See id.* § 395.014. The plan is prepared by licensed engineers and is a determination of the total capacity, current usage, and commitments of usage of existing capital improvements, a determination of the capital improvements or facility expansions "necessitated by and attributable to new developments in the service area," and "the projected demand for capital improvements or facility expansions required by new service units projected over a reasonable period of time, not to exceed 10 years." *Id.* § 395.014(a). Chapter 395 also sets out the method for determining the maximum fee per service unit. *Id.* § 395.015.

In this case, the City hired an engineering firm to prepare a capital improvements plan concerning the City's roadways, water, and wastewater. This plan is a precise mathematical formulation of the impact of development on the City's roadways and water and sewer facilities. From this study, the City could determine Alexander Court's projected impact with precision that far exceeded the constitutional requirement of rough proportionality. Because the statute requires the impact fees be spent only on the designated capital improvements, roadways and water and sewer services in this case, the impact fees bear an essential nexus to the substantial advancement of legitimate government interests. We conclude the trial court did not err by granting the City's motion for summary judgment and by denying appellant's motion on the impact fees.

**Construction Inspection Fees**

The City required appellant to pay construction inspection fees of $21,189 as a condition for approval of the subdivision. The inspection fees are determined as two or four percent of the developer's contract for the construction.

Appellant met its summary judgment burden of proving the fees were an exaction. The burden then shifted to the City to prove the essential nexus/rough proportionality test. The City argued the fees met the proportionality test because they were directly proportional to the value of the construction. The impact of the development, for this item, is the City's costs for the inspections, not the value of the construction. Griffin testified that the fees were "proportional to the impact that Alexander Court had on the city's time and resources for inspection," and he testified that there was at least one inspector at the development every day. However, the City presented no evidence of its costs for the inspectors or the proportion of the time the inspectors spent at the development. Griffin's bare conclusion lacking any factual support that the fees were roughly proportionate is insufficient to establish the rough proportionality of the fees as a matter of law. *See Riner v. Neumann*, 353 S.W.3d 312, 321 (Tex. App.—Dallas 2011, no pet.) ("a conclusory statement in an affidavit can neither support nor defeat summary judgment"). Accordingly, we conclude the trial court erred by granting the City's motion for summary judgment on this item.

Griffin's testimony was sufficient to raise a genuine issue of material fact whether the inspections were an essential nexus of a legitimate state interest, the safe and lawful development of the property, and that some of the fees could be roughly proportional to the projected impact of the development, the City's costs for the inspections. Accordingly, we conclude the trial court did not err by denying appellant's motion for summary judgment on this item.

## Redundant Water-Bacteria Test

Appellant complains the City required two water-bacteria tests to obtain approval of the subdivision when one would have been sufficient. Griffin testified the water-bacteria tests determine whether there is harmful bacteria in the development's waterlines. The tests protect the City's water system from bacteria that could pollute the water system. State regulations require at least one test for each 1000 feet of waterline. 30 TEX. ADMIN. CODE § 290.44(f)(3). Alexander Court had more than 1000 feet of waterline, so two tests were required. The City established the second test bore an essential nexus to the legitimate government interest of protecting the public water system from contamination. Because Alexander Court contained more than 1000 feet of waterline, the requirement of the second test was roughly proportionate to the projected impact of the development on the City's water system. We conclude the trial court did not err by granting the City's motion for summary judgment and denying appellant's motion on this item.

## .725 Acre Land Surrender

Appellant contends the City required it to "surrender" a .725 acre tract to a neighbor below market value to obtain the City's approval for the subdivision. Appellant seeks compensation of $120,000, representing the amount below market value the neighbor paid for the tract.

The record contains conflicting evidence of whether there was an exaction. Hawkins testified generally in his affidavit and at the City Council hearing that the City required him to resolve a dispute over the .725 acre tract before it would approve the subdivision. However, the more specific evidence shows the following. When appellant submitted its preliminary plot of the subdivision for twenty-six lots, there was a boundary dispute with a neighbor over a .725 acre triangular tract at the southwest corner of the subdivision and an approximately 3100 square foot

"sliver" on the western border. The sliver was platted as part of Alexander Court. The preliminary plat for twenty-six lots showed some of the boundary lines running through the .725 acre tract. Previous versions of the preliminary plat showed different square footage for lot eight, which, on the twenty-six lot plat, bordered the .725 acre tract. On January 14, 2007, the City conditioned approval of the preliminary plat, instructing appellant to "[r]esolve the conflicts with the size of the property and the boundary of proposed Lot 8." It does not appear that lot eight bordered on the sliver. Later, when the plat was resubmitted with twenty-nine lots, the .725 acre tract was no longer a concern for the City, but the City still required appellant to resolve the boundary dispute over the sliver before it would accept the final plat. In a "DRC Report" dated December 18, 2007, the City mentioned appellant's need "to work out the boundary dispute on the west side." Appellant offered to trade the sliver for a similar-sized tract to the neighbor, but the neighbor did not accept the offer. The neighbor demanded appellant sell him the .725 acre tract to which he also had a deed.[11] On January 14, 2008, Hawkins wrote to the City stating he had instructed his surveyor to remove the disputed sliver from the plat. The record contains no response from the City to this letter and does not show whether the City continued to demand appellant resolve the dispute over the sliver. Likewise, the record does not show whether appellant redrew the property lines to omit the sliver and submitted the revised documents to the City before appellant sold the property to the neighbor. On February 27, 2008, appellant deeded the .725 acre tract to the neighbor, and the neighbor deeded the sliver to appellant and paid appellant $25,000.

Thus, according to Hawkins's general statements, the City conditioned approval of the subdivision on resolution of the dispute over the .175 acre tract. The more specific testimony

---

[11] Both appellant and the neighbor had quitclaim deeds for the .725 acre tract. Appellant's title policy did not cover the .725 acre tract. The sliver was included in appellant's warranty deed and was covered by appellant's title policy.

shows the City conditioned approval on resolution of the sliver, and the sale of the .725 acre tract was part of the agreement with the neighbor to solve the dispute over the sliver. Under this view of the facts, the "surrender" of the .725 acre tract was not an exaction because, after the twenty-nine-lot plat was filed, the City did not require appellant to resolve the dispute concerning the .725 acre tract. There is also a fact issue regarding whether the City continued to condition approval of the subdivision on appellant's resolution of the boundary dispute over the sliver after Hawkins's January 14, 2008 letter stating the sliver would be removed from the subdivision. Accordingly, we conclude the trial court did not err by denying appellant's motion for summary judgment on this item.

The City's motion for summary judgment asserted there was no exaction because the City's requirement, if any, to appellant was to resolve the dispute over the .725 acre. The City argues it did not require appellant to resolve the dispute by selling the property or to sell the .725 acre tract for any price less than its full market value. If the City conditioned its approval of the subdivision on the resolution of the .725 acre tract, then there was an exaction. That it did not require the sale of the property at below market value does not mean there was no exaction.

The City also presented evidence that the requirement of resolution of boundary disputes for the plat is necessary because the plat defines the property for the subdivision. Thus, if there was a boundary dispute, then the requirement of resolution of that dispute bore an essential nexus to the substantial advancement of the legitimate government interest of clear property boundaries in the real estate records. This condition was roughly proportional to the projected impact of the development on the records. However, if there was no boundary dispute after January 14, 2008, and if the City continued to condition approval of the final plat on resolution of the dispute over the sliver, then the City's essential-nexus/rough-proportionality argument fails. Because fact questions exist concerning whether the City required appellant to resolve the boundary dispute

–33–

when no disputed property was included in Alexander Court, neither appellant nor the City was entitled to summary judgment on this item. We conclude the trial court erred by granting the City's motion for summary judgment but did not err by denying appellant's motion on this item.

### .147 Acre Land Dedication

The City conditioned approval of the subdivision on appellant's dedicating a .147 acre tract for a roadway in front of the subdivision. The parties agree the condition was a compensable exaction, but they disagreed about the compensation. The City provided compensation to appellant of $21,709.84 for the land dedication, which was the appraised value in the records of the Dallas County Appraisal District. At the City Council hearing and in his affidavit, Hawkins testified the property was worth $46,879, an additional $25,170, based on the per-acre price appellant sold the property to David Weekley Homes.

The City argues appellant is not entitled to additional compensation because appellant, through Hawkins's testimony at the City Council hearing, agreed that the value of the land was $21,709.84 at the time of the dedication. The testimony at the City Council hearing shows the .147 acre tract was dedicated when the final plat was approved. Hawkins testified appellant paid $21,709.84 for .147 acre of raw land when it purchased the property. However, Hawkins did not testify that the land was "raw land" when dedicated or that the value of the land when dedicated was $21,709.84. Instead, he testified the .147 acre was worth $46,879 when dedicated.

As appellant's president, Hawkins is presumed to have had knowledge of the property's fair market value. *See Reid Rd. Mun. Dist. No. 2*, 337 S.W.3d at 849; *Corniello*, 344 S.W.3d at 607. Hawkins testified the property was worth $46,879. The City presented evidence the land in its raw state was worth $21,709.84, but it presented no evidence the land was raw at the time of dedication or that its value at the time of dedication was $21,709.84.

We conclude the trial court erred by granting the City's motion for summary judgment and denying appellant's motion on this item. The City is entitled to credit the $46,879 for the .147 acre tract against the roadway impact fees of $18,444 due from the development. *See* TEX. LOC. GOV'T CODE ANN. § 395.023. Accordingly, we render judgment that appellant recover $28,435 for the value of the .147 acre tract minus the amount of the roadway impact fees.

## Roadway Cleanup

Appellant also asserts, and Hawkins testified, the City conditioned approval of the subdivision on appellant clearing the .147 acre tract the City exacted for a roadway right of way. Hawkins testified appellant paid a contractor $8030 to perform this work.

Appellant established that clearing the roadway right of way was an exaction. The City presented no argument or evidence in support of the essential-nexus/rough-proportionality test on this item. Accordingly, we conclude the trial court erred by granting the City's motion for summary judgment and denying appellant's motion as to the $8030 for cleanup of the right of way. We render judgment that appellant recover $8030 for this item.

## Additional Professional Fees

Appellant also asserts it incurred $49,000 in additional fees for surveying, landscape architecture, engineering, and testing for many of the alleged exactions discussed above. These fees are not themselves exactions—the City did not expressly require it incur these costs for the permit to be approved—but are expenses related to the alleged exactions. Accordingly, appellant is not entitled to recover fees corresponding to items on which we have concluded the trial court did not err by granting the City's motion for summary judgment. As for the remaining items, the issue appears to be whether appellant is entitled to recover the fees as a matter of law or whether there is a genuine issue of material fact as to the amount of the fees.

The invoices appellant used to support the compensation claim total $77,761, but Hawkins testified only $49,000 was attributable to the additional, exacted construction. The invoices do not break down their charges by the categories discussed above. For example, the surveying invoices do not identify how much of the fees are attributable to extending the drainage pipe from the floodplain to the creek, and the testing invoices do not explain how much it cost to test the soil for that work. The other professional invoices also fail to identify the part of the construction project to which they relate. The invoices provide no means to tie their amounts to the exactions discussed above.

At the City Council hearing, Hawkins testified he was unable to segregate how much of the fees were related to exactions concerning municipal infrastructure. In his affidavit in support of appellant's motion for summary judgment, appellant broke down the charges into "surveying and landscape architect costs" and "engineering and testing costs" for each item—rolled curbs, raised pad sites, etc. The invoices themselves give no indication how much of each invoice is attributable to each item, and appellant did not explain how he determined the invoice amounts attributable to each item.

The City asserts a genuine issue of material fact exists as to the amount of fees if any, attributable to each item. We agree. Hawkins, as appellant's president, was an interested witness, and summary judgment may not be based on his testimony unless it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c). Appellant's unexplained testimony in his affidavit of the amount of fees related to each item could not have been readily controverted and will not support summary judgment. Accordingly, we conclude the trial court did not err by denying appellant's motion for summary judgment as to the professional fees.

The City's motion for summary judgment does not appear to move for summary judgment on the fees themselves but instead appears to assert a fact issue exists on the fees related to any items that appellant may prove are a compensable exaction.[12]  Accordingly, we conclude the trial court erred by granting the City's motion for summary judgment on the professional fees related to the items on which the court erroneously granted the City's motion for summary judgment:  offsite sidewalk, additional storm drain construction and riprap, retaining walls and four-to-one slope, park fees, tree retribution fees, inspection fees, .725 acre tract, .147 acre land dedication, and roadway cleanup.

### Delays

Appellant asserts it is entitled to compensation of $123,000 for its delays in construction while waiting for the City to approve the final plat and applications for building permits.  Delays are not exactions because they are not conditions for approval.  Appellant's argument fails to explain the legal basis for the claim that these delays are compensable.  We conclude appellant has failed to show the trial court erred by granting the City's motion for summary judgment and denying appellant's motion as to the claim for compensation from the delays.

### Conclusion

We sustain appellant's first and second issues in part and overrule them in part.[13]

### TEXAS CONSTITUTION

In the fifth issue, appellant contends the trial court erred by granting the City's motion for summary judgment and denying appellant's motion on appellant's exaction claims under the

---

[12] The City argued in its motion for summary judgment,

> It is clear that these fees are not "stand-alone" damages items, but are instead ancillary to the other requirements that Mira Mar complains of.  As such, Mira Mar is not entitled to these fees unless it can prevail on the other claims, and definitively segregate these fees among the items, if any, that it has prevailed on.

[13] The parties agreed appellant was entitled to $4500 for an extraneous water tap, and we render judgment that appellant recover that amount.

Texas Constitution. In its petition, appellant pleaded that the alleged exactions were illegal takings and exactions under the Texas Constitution.

The Texas Constitution protects against the government's taking of property for public use without compensation. TEX. CONST. art. I, § 17. Appellant asserted in its motion for summary judgment that the Texas Supreme Court has stated an alternate standard for the compensability of exactions under the Texas Constitution. Instead of the essential-nexus/rough-proportionality test, which did not exist at the time, the supreme court considered whether the cost to the landowner for the public improvement exacted was materially greater than the benefits conferred by the public improvement. *See Stafford Estates*, 135 S.W.3d at 642 (quoting *Haynes v. City of Abilene*, 659 S.W.2d 638, 641 (Tex. 1983); *Hutcheson v. Storrie*, 51 S.W. 848, 850 (Tex. 1899) (quoting *Vill. of Norwood v. Baker*, 172 U.S. 269, 279 (1898))). In *Stafford Estates*, the Texas Supreme Court observed that, although the parties had not argued a distinction between the federal and state constitutional standards, application of the *Nollan/Dolan* essential-nexus/rough-proportionality standard in the circumstances of that case—a developer required to repave in concrete an asphalt road outside the development—"is certainly consistent with, if not required by, well-established Texas law," including *Hutcheson v. Storrie*. *Stafford Estates*, 135 S.W.3d at 631, 642.

Appellant asserts the trial court erred by granting the City's motion for summary judgment and denying appellant's motion on appellant's exaction claims under the Texas Constitution because the City's motion for summary judgment and response to appellant's motion for summary judgment did not address those claims. We disagree. Both the City's motion for summary judgment and its response to appellant's motion for summary judgment address the Texas Constitution. Moreover, appellant's brief on appeal fails to show how the outcome of any of the alleged exactions would be different under the Texas Constitution's

–38–

"materially greater than the benefits conferred" standard.[14]  *See* TEX. R. APP. P. 44.1(a)(1).

Accordingly, we conclude appellant has failed to show the trial court erred by granting the City's

motion for summary judgment and denying appellant's motion on appellant's exaction claims

under the Texas Constitution.  We overrule appellant's fifth issue.

## LOCAL GOVERNMENT CODE § 212.904

Appellant's remaining issues concern the trial court's application of Local Government

Code section 212.904.  When a municipality requires a developer to bear part of the cost of

improvements to the municipality's infrastructure as a condition for approval of a development

project, Local Government Code section 212.904[15] provides limits on the amounts the developer

may be required to pay:  "the developer's portion of the costs may not exceed the amount

required for infrastructure improvements that are roughly proportionate to the proposed

development as approved by a professional engineer . . . retained by the municipality."  TEX.

LOC. GOV'T CODE ANN. § 212.904(a) (West 2008).  If the developer disagrees with the

---

[14] We do not decide in this case whether the "materially greater than the benefits conferred" standard remains applicable.

[15] Section 212.904 provides,

Apportionment of Municipal Infrastructure Costs

(a) If a municipality requires as a condition of approval for a property development project that the developer bear a portion of the costs of municipal infrastructure improvements by the making of dedications, the payment of fees, or the payment of construction costs, the developer's portion of the costs may not exceed the amount required for infrastructure improvements that are roughly proportionate to the proposed development as approved by a professional engineer who holds a license issued under Chapter 1001, Occupations Code, and is retained by the municipality.

(b) A developer who disputes the determination made under Subsection (a) may appeal to the governing body of the municipality. At the appeal, the developer may present evidence and testimony under procedures adopted by the governing body. After hearing any testimony and reviewing the evidence, the governing body shall make the applicable determination within 30 days following the final submission of any testimony or evidence by the developer.

(c) A developer may appeal the determination of the governing body to a county or district court of the county in which the development project is located within 30 days of the final determination by the governing body.

(d) A municipality may not require a developer to waive the right of appeal authorized by this section as a condition of approval for a development project.

(e) A developer who prevails in an appeal under this section is entitled to applicable costs and to reasonable attorney's fees, including expert witness fees.

(f) This section does not diminish the authority or modify the procedures specified by Chapter 395.

TEX. LOC. GOV'T CODE ANN. § 212.904.

–39–

determination of the amount it is required to pay, the developer "may appeal to the governing body of the municipality" and "present evidence and testimony under procedures adopted by the governing body." *Id.* § 212.904(b). If the developer is dissatisfied with the municipal governing body's decision, the developer "may appeal the determination of the governing body to a county or district court." *Id.* § 212.904(c). If the developer prevails in an appeal under section 212.904, it is entitled to applicable costs and reasonable attorney's fees. *Id.* § 212.904(e).

### Standard of Review of City Council Decision

In the seventh issue, appellant contends the trial court erred by applying a "substantial evidence" standard of review instead of a "trial de novo" standard of review to appellant's appeal of the City Council's decision. Appellant also contends it is entitled to a jury trial.

Section 212.904 does not provide the standard of review to be utilized by the court in determining the appeal of the governing body's decision. In this case, the district court reviewed the City Council's decision under the substantial evidence standard of review. Appellant argues the appropriate standard of review is trial de novo. We agree that the standard of review in the trial court should be trial de novo.

Compensable exactions are constitutional takings. The Texas Supreme Court requires that constitutional takings cases be decided by courts, not government agencies. *City of Dallas v. Stewart*, No. 09-0257, 2012 WL 247966, at *4 (Tex. Jan. 27, 2012). In takings cases, courts may grant deference to questions of historical fact, "but mixed questions of law and constitutionally relevant fact . . . must be reviewed de novo." *Id.* at *10.

Appellant also asserts it is entitled to a jury in the trial de novo review. Whether facts constitute a taking is a question of law. *Mayhew*, 964 S.W.2d at 932, 936. Fact questions as to whether a taking occurred are tried to the court. *See Harris County v. Felts*, 881 S.W.2d 866,

870 (Tex. App.—Houston [14th Dist.] 1994), *aff'd*, 915 S.W.2d 482 (Tex. 1996);[16] *see also*

*Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 557 (Tex. 2004); *Mayhew*, 964 S.W.2d at

932–33. However, the issue of the amount of compensation the property owner is due "is

peculiarly one for the fact finding body," such as a jury. *City of Sherman v. Wayne*, 266 S.W.3d

34, 46 (Tex. App.—Dallas 2008, no pet.) (citing *Tex. Pipe Line Co. v. Hunt*, 228 S.W.2d 151,

156 (Tex. 1950)); *see Gragg*, 151 S.W.3d at 557. We conclude appellant is not entitled to a jury

trial on any fact issues concerning whether an exaction occurred, but appellant is entitled to a

jury trial on any fact questions concerning the amount of compensation, if any, to which

appellant is entitled. Accordingly, we sustain appellant's seventh issue in part and overrule it in

part.

### Due Process Under the City's Procedures

Appellant's fourth and sixth issues concern whether the procedures the City Council

adopted for the second hearing accorded appellant due process. Because we have concluded

review of the City Council's decision should be by trial de novo, any lack of due process at the

City Council hearing could not have caused the rendition of an improper judgment in the trial

court. Accordingly, the error, if any, is not reversible. *See* TEX. R. APP. P. 44.1(a)(1). We

overrule appellant's fourth and sixth issues.

### Attorney's Fees

In the eighth and ninth issues, appellant contends the trial court erred by denying

appellant's request for reasonable attorney's fees. Section 212.904 states, "A developer who

---

[16] In *Felts*, the court of appeals described the procedure in an inverse condemnation case as follows:

> The proper procedure to be followed in a case of this type is that once the presentation of the evidence was completed, the trial judge, not the jury, should have decided whether there was a compensable taking under the Texas Constitution. Only if the Court answered that question in the affirmative should the court have submitted an issue concerning the amount of damages. Only then would this case have been decided in accordance with Texas law.

*Felts*, 881 S.W.2d at 870.

prevails in an appeal under this section is entitled to applicable costs and to reasonable attorney's fees, including expert witness fees." TEX. LOC. GOV'T CODE ANN. § 212.904(e). In both the eighth and ninth issues, the question is whether appellant "prevail[ed]" in the "appeal."

Section 212.904 provides two different appeals. The first appeal is to "the governing body of the municipality" and is an appeal of "the determination made in Subsection (a)," which is the rough-proportionality analysis. *Id.* § 212.904(b). At the hearing, the developer may present evidence "under procedures adopted by the governing body." After the governing body makes its "determination," the developer may appeal that determination to the county or district court. *Id.* § 212.904(c). Thus, the appeal to the county or district court is from the governing body's "determination" of the rough-proportionality analysis.

In its eighth issue, appellant asserts it is entitled to attorney's fees from its appeal of the City Council's first hearing. In that appeal, appellant argued the City Council's proceedings deprived it of due process. Appellant asserts it prevailed on that claim because the district court found due process violations and ordered the City Council to conduct a second hearing under section 212.904(b). We disagree. Appellant's claim of due process violations by the City Council was an attempt to appeal "the procedures adopted by the governing body." Under the statute, the municipal body's determination, not the procedures it adopted, are the subject of the appeal. Whether appellant prevailed on the "appeal" depends on whether it prevailed in challenging the rough-proportionality analysis and was awarded damages, not on whether it succeeded in challenging the City's procedures for conducting the initial appeal. We conclude the trial court did not err by denying appellant attorney's fees for challenging the City's procedures. We overrule appellant's eighth issue.

In its ninth issue, appellant contends the trial court erred by vacating the City Council's award of attorney's fees and by awarding appellant no attorney's fees even though appellant

–42–

recovered over $40,000 on its claims. The court stated on the bench and in an order that appellant could not be considered a "prevailing party" when it had recovered only about $40,000 while seeking over $800,000 in damages. To be a prevailing party, "a plaintiff must prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief." *Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 652 (Tex. 2009). To the extent appellant recovered $40,000, it was a prevailing party and was entitled to reasonable attorney's fees to the extent permitted by section 212.904(e). Because we have concluded appellant is entitled to compensation on items beyond those found by the trial court and that fact issues exist on other items on which appellant may eventually win compensation, we remand the attorney's fees issue to the trial court for further proceedings.[17] We sustain appellant's ninth issue.

**CONCLUSION**

We reverse the trial court's judgment in part and render judgment in part that appellant recover from the City compensation on appellant's exaction claims of $96,930 consisting of: (1) $21,465 for the offsite sidewalk, (2) $34,500 for the tree retribution fees, (3) $28,435 for the .147 acre tract (consisting of $46,879 for the value of the .147 acre tract minus $18,444 in roadway impact fees), (4) $8030 for roadway cleanup, and (5) $4500 for an extraneous water tap.

We reverse the trial court's judgment on appellant's exaction claims concerning (6) the extension of the storm drainpipe, riprap, and piers; (7) the retaining walls and four-to-one slope; (8) construction inspection fees; (9) .725 acre tract; (10) park fees; and (11) the engineering, surveying, landscape architecture, and testing fees related to items (1) through (10) above, and

---

[17] Appellant's entitlement to attorney's fees comes from section 212.904, which applies only to exactions concerning municipal infrastructure. Section 212.904 does not authorize the award of attorney's fees to a party who prevails on an exaction claim that does not concern municipal infrastructure.

we remand the exaction claims for items (6) through (11) above to the trial court for further proceedings consistent with this Court's opinion.

We further reverse the trial court's denial of attorney's fees to appellant, and we remand the claim for attorney's fees to the trial court for further proceedings consistent with this Court's opinion.

In all other respects, we affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

100283F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT NUNC PRO TUNC

MIRA MAR DEVELOPMENT
CORPORATION, Appellant

No. 05-10-00283-CV        V.

CITY OF COPPELL, TEXAS, Appellee

On Appeal from the 101st District Court,
Dallas County, Texas
Trial Court Cause No. 07-11511-E.
Opinion delivered by Justice Myers.
Justices Lang participating.

Based on the Court's opinion nunc pro tunc of October 7, 2013, we **REVERSE** the trial court's judgment in part and **RENDER** judgment in part that appellant Mira Mar Development Corporation recover from appellee City of Coppell, Texas compensation on appellant Mira Mar Development Corporation's exaction claims of $96,930 consisting of:  (1) $21,465 for the offsite sidewalk, (2) $34,500 for tree retribution fees, (3) $28,435 for the .147 acre tract (consisting of $46,879 for the value of the .147 acre tract minus $18,444 in roadway impact fees), (4) $8030 for roadway cleanup, and (5) $4500 for an extraneous water tap.

We **REVERSE** the trial court's judgment on appellant Mira Mar Development Corporation's exaction claims concerning (6) the extension of the storm drainpipe, riprap, and piers; (7) the retaining walls and four-to-one slope; (8) construction inspection fees; (9) .725 acre tract; (10) park fees; and (11) the engineering, surveying, landscape architecture, and testing fees related to items (1) through (10) above, and we **REMAND** the exaction claims for items (6) through (11) above to the trial court for further proceedings consistent with this Court's opinion.

We further **REVERSE** the trial court's denial of attorney's fees to appellant Mira Mar Corporation, and we **REMAND** appellant Mira Mar Development Corporation's claim for attorney's fees to the trial court for further proceedings consistent with this Court's opinion.

In all other respects, we **AFFIRM** the trial court's judgment.

We **ORDER** that each party bear its own costs on appeal.

Judgment entered this 7th day of October, 2013.

/Lana Myers/
LANA MYERS
JUSTICE