RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0065p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAN MILLER, SUEDE NIGHTS, LLC, JOSEPH CIRINO,
and SPOT 82, LLC (16-3052); JULIOUS MOSLEY and
MOSLEY MOTEL OF CLEVELAND, INC. (16-3053),

                    *Plaintiffs-Appellants,*

    *v.*

CITY OF WICKLIFFE, OHIO,

                    *Defendant-Appellee.*

No. 16-3052/3053

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
Nos. 1:12-cv-01248; 1:13-cv-01646—James S. Gwin, District Judge.

Argued: November 29, 2016

Decided and Filed: March 23, 2017

Before: NORRIS, GIBBONS, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jay F. Crook, SHRYOCK, CROOK & ASSOCIATES, L.L.P., Wickliffe, Ohio, for Appellants in 16-3052 and 16-3053. John D. Latchney, O'TOOLE, MCLAUGHLIN, DOOLEY & PECORA, CO. LPA, Sheffield Village, Ohio, for Appellee. **ON BRIEF:** Jay F. Crook, SHRYOCK, CROOK & ASSOCIATES, L.L.P., Wickliffe, Ohio, for Appellants in 16-3052 and 16-3053. Nick C. Tomino, O'TOOLE, MCLAUGHLIN, DOOLEY & PECORA, CO. LPA, Sheffield Village, Ohio, for Appellee.

    GIBBONS, J., delivered the opinion of the court in which NORRIS, J., joined, and ROGERS, J., joined in the result. ROGERS, J. (pp. 14–16), delivered a separate concurring opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  Plaintiffs-appellants Dan Miller, Joseph Cirino, Julious Mosley, and their respective businesses—Suede Nights, Spot 82, and the Mosley Motel—appeal the district court's summary-judgment orders in favor of defendant Wickliffe, Ohio.  Appellants allege that the city violated their constitutional rights by passing an ordinance that required a "nightclub" permit for certain establishments.  The district court determined that appellants lacked standing and dismissed the case on those grounds but also reached the merits of appellants' claims and held that the Wickliffe's conduct did not offend the Constitution.

Plaintiffs here lack standing to challenge, as-applied or facially, the nightclub ordinance.  Because they cannot demonstrate that Wickliffe had reached a final decision under the ordinance, or that they faced a credible threat of prosecution under it, plaintiffs cannot show a particularized and concrete injury sufficient to confer jurisdiction.  Accordingly, we affirm the district court's dismissal of plaintiffs' claims.

I.

Julious Mosley owned the Mosley Motel in Wickliffe, Ohio ("Wickliffe" or "City").  In 2009, the motel's lounge area was in need of a tenant.  Around this same time, Dan Miller was seeking a new location for his nightclub.  Miller's original nightclub was in neighboring Willoughby, Ohio, and, during its brief time there, had drawn the ire of law enforcement due to allegations of illegal activity by some of its patrons.

Miller found a new home for his nightclub at the Mosley Motel.  In May 2009, Miller and Mosley executed a five-year lease for the motel's lounge, located at 28500 Euclid Avenue in Wickliffe.  Miller then began the process of acquiring the proper permits to operate his nightclub. Miller claims that the City was initially receptive to his nightclub, but, after informing it of his plan to host a "Hip Hop night, [catering] to African American and minority clientele," the City allegedly changed its tune.  (DE 37-1, Miller Aff., Page ID 251–252.)  Miller's

application for an occupancy permit was denied until he submitted revised parking plans that conformed to the City's parking-spot-allotment requirements.

In addition to receiving the proper permits from the City, Miller also needed a liquor license from the State of Ohio. In June 2009, he applied for a D5A-6 liquor permit from the Ohio Division of Liquor Control. The City did not oppose Miller's application, but several Wickliffe religious organizations did. Specifically, Telshe Yeshiva Rabbinical College, All Saints Elementary School, Sacred Heart Chapel, Borromeo Seminary, and the Center for Pastoral Leadership—all of which are located very near or adjacent to the Mosley Motel—asked for a hearing so that they could oppose Miller's application. After hearing from these organizations, the City, while still not formally opposing the liquor permit, passed Resolution 2009-14, which expressed support for the organizations' opposition to Miller's application. The City believed that the sale of alcohol at 28500 Euclid Avenue would be "detrimental to and [would] substantially interfere with the morals, safety and welfare of the residents of Wickliffe" and that the location of the Mosley Motel was so situated that the issuance of a permit would create "substantial interference with the public decency, sobriety, peace, or good order" of the neighborhood. (DE 32-3, Ord. 2009-14, Page ID 195–96.)

The Ohio Division of Liquor Control conducted a hearing on Miller's application in September 2009. Miller claims that, despite having previously waived any objection to his application, "numerous officials" appeared at the hearing, including "the Mayor, the Chief of Police, and members of the Wickliffe City Counsel [sic]." (DE 37-1, Miller Aff., Page ID 253.) Representatives from the religious organizations were also in attendance. The Liquor Control Division ultimately denied Miller's application, citing the objections of the religious organizations and noting that it agreed that granting the application would offend the peace and good order of the neighborhood and would interfere with the operation of the religious organizations and their schools. Despite having the right to do so, Miller did not appeal this decision nor does he allege that it was reached in error.

Resolution 2009-14 was not the City's only action that September. It also unanimously passed Ordinance 2009-49 ("Ordinance"), which required "nightclubs" to obtain a permit before operating. Ordinance 2009-49 defined "nightclub" as:

a place operated for a profit, which is open to the public and provides the opportunity to engage in social activities such as dancing; the enjoyment of live or prerecorded music; the serving of food and beverages, all of which are provided for a consideration that may be included in a cover charge or included in the price of the food or beverage.

(DE 32-4, Ord. 2009-49, Page ID 197.)  The Ordinance divided nightclubs into "adult" and "teen" varieties, with former being open to only those twenty-one years of age and older.  Adult nightclubs could operate any day of the week but had to close no later than 2:30 a.m.  The Ordinance contained many other requirements that delineated the responsibilities of the nightclub and its owner, most of which were obligations to operate the nightclub in a safe and legal manner, such as requiring proper illumination, prohibiting the consumption of illegal substances and loitering, and controlling litter.

The application process was governed by specific rules that were spelled out in Section 747.09 of the Ordinance.  Wickliffe's Director of Public Safety had to act on any application within thirty days.  Additionally, the Ordinance provided that any application would be denied if "the location of the nightclub is within five hundred feet from the boundaries of a parcel of real estate having situated on it a school, church, library, public park, tavern, bar, adult cabaret, or another nightclub" or "within five hundred feet from the boundaries of any residential district." (*Id*. at 200–201.)  The Ordinance also prohibited the issuance of a permit if the applicant had been convicted of certain criminal offenses or if the establishment had its liquor permit revoked by the Liquor Control Division.  Miller, Mosley, and their businesses never applied for a nightclub permit.

After nearly two years' time, Miller entered into an agreement with Joseph Cirino. Cirino paid Miller $40,000 for an ownership interest in a proposed billiards hall at 28500 Euclid Avenue.  That business—Spot 82, LLC—initially had been granted a temporary-occupancy permit by the City, but, about two weeks after its issuance, that permit was revoked by a cease-and-desist letter.  The cease-and-desist letter did not give a reason for the revocation of Spot 82's temporary-occupancy permit, but, in his affidavit, Miller claims he later learned that the permit was revoked because Spot 82 "looked too much like a night club." (DE 37-1, Miller Aff., Page ID 254.)

On May 17, 2012, Cirino, Miller, Mosley, and their respective business entities filed a complaint in federal court for the Northern District of Ohio. The complaint, as amended, raised eight claims: (1) a request for declaratory relief under 42 U.S.C. § 1983 due to Ordinance 2009-49's alleged vagueness, overbreadth, and illegal retroactivity; (2) injunctive relief under § 1983 premised on the same; (3–5) three separate violations of 42 U.S.C. § 2000A for intentional racial discrimination, selective enforcement, and disparate impact; (6) a violation of 42 U.S.C. § 1983 based on equal-protection violations; (7) tortious interference with a contract; and (8) tortious interference with a business relationship. On July 30, 2013, Mosley filed another lawsuit against the City that raised the same claims as the earlier complaint but added two Takings Clause claims as well. The two cases were subsequently consolidated (at Mosley's request), and then severed (also at his request).

The district court dismissed both cases, relying primarily on standing principles. Specifically, the district court found that plaintiffs lacked an injury in fact because none of them actually applied for a permit under the nightclub ordinance. Additionally, the court found that, if plaintiffs wished to sue the city for the passage of Ordinance 2009-49, they could not show more than a "generalized grievance," which it claimed was insufficient to confer standing.

The district court also held that plaintiffs had a redressability problem due to the State of Ohio's independent decision to deny Suede Nights a liquor permit. Making the practical assumption that plaintiffs could not operate their nightclub without a liquor license, the district court found that, even if the ordinance was unconstitutional, plaintiffs would still be foreclosed from opening a nightclub.

The district court also reached the merits of some of plaintiffs' claims. It found that Ordinance 2009-49 did not implicate the First Amendment because it "regulates permits for businesses, not expression or assembly." (DE 44, Op. & Order, Page ID 479.) Further, the district court found that the ordinance was not overbroad or void for vagueness. Finally, it dismissed the intentional tort claims against the city on statutory-immunity grounds. In a separate order, but applying all the same reasoning, it dismissed Mosley's identical claims. Additionally, the district court found that Mosley's Takings Clause claim was not ripe for review because he had failed to pursue the requisite administrative remedies—namely, he had not

followed Ohio's writ-of-mandamus procedure in pursuing compensation for the City's alleged regulatory taking. All plaintiffs filed timely appeals, which have been consolidated for review.

II.

We review the district court's grant of summary judgment *de novo*. *Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016) (citing *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 542 (6th Cir. 2014)). Construing the evidence in the light most favorable to the nonmovant, *id.* (citing *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, we review a district court's dismissal of claims for lack of standing *de novo*. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir. 2007) (citing *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004)).

III.

At oral argument, plaintiffs conceded that they were challenging only the facial validity of the Ordinance, but then proceeded to make as-applied arguments. Thus, it is unclear what the precise nature of their challenge is. What is clear, however, is that their appeal is limited to the constitutionality of the Ordinance and that they have waived all other claims.

As an initial matter, plaintiffs need to establish standing for their as-applied and facial challenges. For the reasons explained below, plaintiffs' claims are non-justiciable and must be dismissed.

A.

The district court dismissed the majority of plaintiffs' claims because it found that they had not suffered an injury in fact. Plaintiffs claim that challenging the Ordinance would have been futile and allege that this excuses their failure to apply for a permit. The district court was right: the failure to apply for a permit bars any as-applied claims plaintiffs could make regarding the constitutionality of the Ordinance.

The power of the federal courts is limited to hearing actual cases and controversies. U.S. Const. art. III, § 2, cl. 2; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Of course, determining which disputes are "appropriately resolved through the judicial process" is no simple task. *Whitmore v. Arkansas*, 495 U.S. 149, 154–55 (1990). Constitutional standing has three elements that serve as its irreducible minimum in all cases. *Lujan*, 504 U.S. at 560. "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical." *Id*. (internal citations and quotations omitted) (citing *Allen v. Wright*, 468 U.S. 737, 756 (1984) and *Whitmore*, 495 U.S. at 155). Second, a plaintiff must demonstrate causation—*i.e.*, that her injury is "fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court." *Id*. (internal alterations and quotations omitted) (citing S*imon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Lastly, the plaintiff must prove that it is likely, rather than merely speculative, that a favorable decision could redress the injury.[1] *Id*. at 561.

Here, Wickliffe argued, and the district court found, that plaintiffs lacked constitutional standing to challenge the Ordinance because they never applied for a permit. The district court held that, because the City never denied, or even reviewed, a nightclub application from any of the plaintiffs, they cannot demonstrate an injury in fact. Additionally, the district court found that plaintiffs had a redressability problem because, even if they were awarded a nightclub permit, the State of Ohio's independent denial of their liquor permit effectively prohibited them from opening a nightclub at 28500 Euclid Avenue. The district court invoked prudential-standing requirements as well and found that plaintiffs lacked standing because they could not

---

[1]The district court found that plaintiffs lacked standing on redressability grounds, as well as due to the absence of an injury in fact. The district court relied on the State of Ohio's independent decision to deny Suede Nights' liquor permit application in determining that, even if the Ordinance was unconstitutional, Miller still could not have opened his nightclub. This assumes that one must serve liquor in order to run a nightclub, a presupposition that is as reasonable as it is erroneous. The district court's reliance on the denial of the liquor permit in finding a lack of redressability was in error, but it does not affect the outcome here.

show more than a "generalized grievance regarding Ordinance 2009-49."**2** (DE 44, Op. & Order, Page ID 476–477.)

Plaintiffs' as-applied constitutional claims regarding Ordinance 2009-49 are non-justiciable. First, as the district court found, they lack an injury in fact because the Ordinance has not yet been applied to them. Their injury is conjectural and hypothetical, rather than concrete and particularized. *Lujan*, 504 U.S. at 560. Any decision from this court regarding how the nightclub statute could or would apply to plaintiffs' proposal would be advisory. *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 715 (6th Cir. 2011) ("The 'case or controversy' requirement prohibits all advisory opinions, not just some advisory opinions and not just advisory opinions that hold little interest to the parties or the public."). Second, any as-applied challenge to the Ordinance is not ripe. Ripeness is related to standing, and shares a foundation in Article III's case-and-controversy requirement. *Bigelow v. Mich. Dep't of Nat. Res.*, 970 F.2d 154, 157 (6th Cir. 1992). The question here is whether there is a final decision by a state actor for review. *Bannum v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992).

Plaintiffs invoke the futility doctrine and argue that the City's decision was sufficiently final to excuse their failure to apply for a nightclub permit. In essence, they argue that it is clear—from the history of the Ordinance's passage and from the language of the law itself—that Wickliffe would have denied their application to open a nightclub, and thus, it would have been pointless for them to waste the time doing so.

The doctrine of futility does not save plaintiffs' claims because they have failed to demonstrate that the City's decision was sufficiently final to constitute an injury in fact. Although there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action, *Patsy v. Fla. Bd. of Regents*, 457 U.S. 496, 507 (1982), plaintiffs must still

---

**2**Although the concurrence recommends disposing of this case on prudential-ripeness grounds, we need not reach that issue here. Given the Supreme Court's questioning of the continued vitality of the prudential-standing doctrine, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2346–47 (2014), and the doubt that has been cast upon it by our own decisions, *Kiser v. Reitz*, 765 F.3d 601, 606–07 (6th Cir. 2014), we are hesitant to ground our decision in prudential-standing principles. The concurrence is correct that *Lexmark*, *Driehaus*, and *Kiser* do not affirmatively state that the prudential-standing doctrine is dead, and we cannot predict its future. But, in view of the question, we choose to rely on a more solid foundation for deciding the case—namely, constitutional-standing principles.

answer the conceptually distinct question of whether there is a final decision for this court to review. *Williamson Cty. Reg'l Planning Comm'm v. Hamilton Bank of Johnson City*, 473 U.S. 172, 192 (1985) (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 243 (1980)). Exhaustion and finality certainly are kindred concepts, but the "finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury," while the exhaustion requirement "generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* at 193. Thus, exhaustion presupposes a decision has been made, whereas finality simply searches for a decision to review.

There is no final decision here. The district court found that, while "[p]laintiffs make some showing that Wickliffe would likely have denied Plaintiffs' application for a nightclub permit, they do not make a strong showing." (DE 44, Op. & Order, Page ID 476.) We agree, and our precedent supports the district court's decision to dismiss this matter. For example, in *Bannum v. City of Louisville*, we found that, despite not applying for a conditional-use permit from the City of Louisville, the plaintiffs had sufficiently demonstrated the city's "adamant opposition" to plaintiffs' proposal, and it was not unreasonable to find that "further proceedings would not have been productive." 958 F.2d at 1363. Relying on the Ninth Circuit's formulation of the "futility exception" to the finality requirement, we found that, where plaintiffs can demonstrate that a decisionmaker has reached a final determination and further applications would be "idle and futile act[s]," the finality requirement is satisfied. *Id.* The *Bannum* court noted, however, that "[f]or the exception to be available to [plaintiffs], [they] must have submitted at least one meaningful application." *Id.* (quoting *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454–55 (9th Cir. 1987)). We found that Bannum's affidavits to the city in which he requested a variance, and to which the city responded by informing him that a "nonconforming use variance was not forthcoming," was sufficient, when coupled with the city's open opposition, to satisfy the futility exception. *Id.*

*G & V Lounge v. Michigan Liquor Control Commission* is also instructive. 23 F.3d 1071 (6th Cir. 1994). In that case, we found that plaintiffs, despite not yet having taken any action or

having any action taken against them, had standing to challenge a Michigan liquor-control regulation. That regulation provided that "no establishment with a liquor license shall permit dancing or other forms of entertainment without a permit, and that no entertainment permit shall be issued without the approval of the chief local law enforcement officer with jurisdiction over the establishment, the local legislative body, and the commission itself." *Id*. at 1073. The regulation provided no standards governing local approval of a requested permit. *Id*. G & V Lounge wanted to offer topless dancing, but the city attorney informed it that any attempt to do so would result in the city's recommendation that the lounge's liquor license be revoked and could also result in the city's revoking or not renewing its entertainment permit. *Id*. at 1073–74. Noting that G & V's licenses had not been revoked or non-renewed, the court held that "[i]t is well-established that 'when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license.'"[3] *Id*. at 1075 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). In *G & V*, the city made clear that any adult entertainment at the lounge would result in the revocation of its licenses, making the harm imminent. *Id*. Lastly, the chilling effect that the city's threat had on G & V was a distinct and palpable injury. *Id*. at 1076. This court found that each of these injuries was directly traceable to the actions of the city and could be redressed by a favorable decision. *Id*.

The case before us is distinguishable from *Bannum* and *G & V*. Here, Wickliffe never indicated that it would not permit plaintiffs to open their nightclub. True, it denied their initial occupancy application because it alleged that the nightclub's parking was insufficient under the relevant ordinance, but it offered them an alternative route: submit a conditional-use permit with revised parking plans. Plaintiffs never did so. Moreover, as the district court found, it is far from clear that the nightclub ordinance would have necessarily prohibited plaintiffs from opening a nightclub. Had plaintiffs actually applied for such a permit, we and the district court

---

[3]In some ways, *G & V* simply converted the plaintiff's attempt to utilize the futility exception into a facial challenge. Whether we found standing there based on a sufficiently final decision or on a credible threat of enforcement, the case demonstrates the type of government action sufficient to create an injury in fact.

would have a decision, and a record, upon which to make a determination. But, again, plaintiffs never sought the required permit.

Additionally, while the record indicates that some city-council members were opposed to Suede Nights receiving a liquor permit and that the city council passed a resolution indicating its support for those Wickliffe citizens who opposed the issuance of such a permit, the City did not formally object. Wickliffe officials noted that their lack of formal objection was because the City concluded that it did not have legal justification to do so. These statements, far from indicating a local government that will block a company's request regardless of the law, instead show one that knows and respects the limitations on its authority. And, while the city council created the Ordinance, it was not tasked with rendering decisions on applications; instead, that obligation fell to the Wickliffe Director of Public Safety. Thus, under its very detailed ordinance, the City lacked discretion to deny plaintiffs' application, and the comments of the city-council members are not probative of the decisionmaker's closed mind. This fact further distinguishes this case from *Bannum* and *G & V*, where the decisionmakers had demonstrated "adamant opposition" to those plaintiffs' proposals, *and* had unbridled discretion in rendering decisions. *Bannum*, 958 F.2d at 1363; *G & V Lounge*, 23 F.3d at 1075–76. Plaintiffs have not demonstrated that there is final decision for this court to review. Accordingly, standing and ripeness doctrines bar plaintiffs' as-applied claims to the Ordinance and its passage.

B.

Plaintiffs also lack standing to challenge the facial validity of the ordinance. There may be very little difference to the standing requirements for as-applied and facial challenges, other than the former being the easier of the two. *See Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) ("[I]f there is any difference between the standing requirements for as-applied and facial challenges, it is because raising a narrow as-applied challenge is easier . . . than raising a facial challenge."). Facial challenges, like as-applied ones, require ripeness as well as standing. *Id.* In the pre-enforcement First Amendment context, "[t]he line between Article III standing and ripeness . . . has evaporated." *Id.* (citing *Driehaus*, 134 S. Ct. at 2346–47). Standing and ripeness both originate from Article III's case-or-controversy requirement, and require us to

answer the same question: have plaintiffs established a credible threat of enforcement?  Plaintiffs here have not.

"A plaintiff meets the injury-in-fact requirement—and the case is ripe—when the threat of enforcement of that law is 'sufficiently imminent.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 451 (6th Cir. 2014) (citing *Driehaus*, 134 S. Ct. at 2342).  The threat of enforcement is sufficiently imminent when "(1) the plaintiff alleges 'an intention to engage in a course of conduct' implicating the Constitution and (2) the threat of enforcement of the challenged law against the plaintiff is 'credible.'" *Id*. at 451–52 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Even assuming that plaintiffs' facial challenges to the vagueness and overbreadth of the Ordinance implicate constitutionally protected conduct, they have failed to show that the threat of enforcement against them was credible.

A threat is credible, in this context, if a person must censor herself to avoid violating the law in question.  *Id*. at 452 (citing *Carey v. Wolnitzek*, 614 F.3d 189, 196 (6th Cir. 2010)).  Here, plaintiffs were not required to censor themselves, at this point, to avoid violating the Ordinance.  Instead, plaintiffs needed only to apply for a license to discover whether they could open their businesses.  This not only would have solved their facial-standing problem, but would have given them standing for a bevy of as-applied challenges as well.  And merely applying for a license, as opposed to engaging in some allegedly protected conduct and fearfully waiting for potential prosecution, does not carry the same risk that is normally seen in facial-challenge cases. In fact, here, it carried no risk.  The City's denial of plaintiffs' license would have acted as a de facto "warning letter" that plaintiffs' conduct was potentially subject to prosecution.  *See Winter*, 834 F.3d at 687–88 (finding standing in the pre-enforcement First Amendment context where plaintiffs were told by the state supreme court that certain regulations proscribed their speech and governing body had told them that it planned to enforce the regulations against them).  But that is not the case (to the extent one is present here at all) that we have before us.

The City never indicated that it would deny plaintiffs' nightclub permit or that it would enforce the Ordinance against plaintiffs.  And any attempt by plaintiffs at seeking approval for their businesses was unrelated to the Ordinance in question.  Miller and Mosley's occupancy

permit was denied because the Mosley Motel lacked sufficient parking.  Likewise, Cirino and Spot 82 were given a temporary-occupancy permit that was subsequently revoked, but this action was unrelated to the Ordinance.  Because plaintiffs challenge only the validity of the Ordinance, these administrative actions, unrelated to the Ordinance in question, do not support a credible threat of enforcement under it.

All plaintiffs here can say is that, *had* they done this or that, the City *might* have taken some action against them.  This is the exact sort of hypothetical and speculative dispute that Article III proscribes from federal-court dockets.  Ultimately, plaintiffs' standing impediments, whether to their as-applied or to their facial challenges, stem from the same problem: they have failed to demonstrate that the City made a decision sufficiently final, or a threat sufficiently credible, to establish a concrete and particularized injury.

IV.

For the reasons stated above, we affirm the district court's dismissal of plaintiffs' claims.

———————————

**CONCURRENCE**

———————————

ROGERS, Circuit Judge, concurring.   I concur in the result but disagree with the majority's reasoning.  Plaintiffs' request for pre-enforcement judicial review of Ordinance 2009-49 is not ripe—not in the constitutional sense of the doctrine, but based on the court's equitable discretion to decline review.

Plaintiffs seek to challenge Wickliffe's Ordinance 2009-49, which requires a business to obtain a permit before operating a nightclub, without first applying for the required permit. Plaintiffs thus ask the court to construe and judge the law before it has been applied—the classic case of pre-enforcement review.  In particular, plaintiffs request declaratory and injunctive relief, which are equitable remedies.  Federal courts have discretion over whether to grant such equitable remedies and may decline to exercise judicial review if a controversy is not ready to be decided. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  When a challenged rule of law is final, but the relevant authority has not yet enforced the law, courts often decline review because the otherwise vague or ambiguous rule may be limited or become clear through application.  *Id.* The decision to decline judicial review in such cases is a matter of equitable discretion, not based on Article III's case-or-controversy requirement.

We should not anticipate the Supreme Court overruling such a significant line of precedent as the equitable ripeness doctrine without a clear dictate from the Court.  It is true that the Court appeared hesitant to reaffirm the doctrine in *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014), reasoning: "To the extent respondents would have us deem petitioners' claims nonjusticiable 'on grounds that are "prudential," rather than constitutional,' '[t]hat request is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'"  (alteration in original) (internal quotation marks omitted) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014)).  In the same breath, however, the Court declined to decide the doctrine's "continuing vitality."  *Id.*  The Supreme Court has advised lower courts to follow its precedent until the Court expressly overrules itself—"leaving to [the Supreme Court] the

prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975). Thus, until the Court declares otherwise in a clear voice, we should continue to apply the equitable ripeness doctrine when, as now, it is relevant.

The Supreme Court has summarized the proper inquiry as follows:

In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." [*Abbott Labs.*, 387 U.S. at 149.] To do so in this case, we must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

First, the plaintiffs will suffer minimal hardship when judicial review is denied at this stage. Unlike cases where denying pre-enforcement review would force parties to immediately take action to avoid violating the law, Ordinance 2009-49 has no immediate implications for plaintiffs until they apply for and are denied a permit. Plaintiffs were not operating a nightclub before the City passed the law, so contrary to their assertions, they do not face immediate criminal prosecution without judicial review. Second, the City should not have to defend the content of its ordinance without applying it to a particular applicant. Because plaintiffs never applied for a permit, it is impossible to know whether the City would deny one. Finally, the record is not full enough for effective judicial review; indeed, there is no indication about how the City will apply the Ordinance. Although plaintiffs assert that applying for a permit would be futile, given the Ordinance's strict location limitations, *see* Wickliffe, Ohio, Code § 747.09 (2017), there is no record evidence to prove that plaintiffs' proposed nightclub location violates those restrictions.

Plaintiffs' claims are accordingly not justiciable because they are not ripe, and there is no need to reach Article III standing. Ruling on Article III standing grounds unnecessarily limits the power of Congress. Where there is no standing, Congress cannot permit judicial review even if Congress would weigh the ripeness factors entirely differently. In this case that means that

Congress *could not* permit judicial review at a pre-enforcement stage like that presented here, even at the behest of the very people that the Ordinance appears to be regulating. We should not so limit the power of Congress, when the Supreme Court has provided a fully formed and nuanced equitable ripeness doctrine for us to employ, a doctrine that balances (subject to congressional correction) the interests of regulated parties in avoiding pre-enforcement harms with the interests of administrative bodies in executing public policy and the interests of courts in avoiding abstract disputes.