RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

F.P. DEVELOPMENT, LLC,
          *Plaintiff-Appellee/Cross-Appellant*,

          *v.*

CHARTER TOWNSHIP OF CANTON, MICHIGAN,
          *Defendant-Appellant/Cross-Appellee*.

⎤
⎟
⎟
⎬  Nos. 20-1447/1466
⎟
⎟
⎦

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-13690—George Caram Steeh, III, District Judge.

Argued: June 10, 2021

Decided and Filed: October 13, 2021

Before: COLE, BUSH, and NALBANDIAN, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Anne McClorey McLaughlin, ROSATI, SCHULTZ, JOPPICH & AMTSBUECHLER, P.C., Farmington Hills, Michigan, for Appellant/Cross-Appellee. Chance Weldon, TEXAS PUBLIC POLICY FOUNDATION, Austin, Texas, for Appellee/Cross-Appellant. Richard K. Norton, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, Ilya Shapiro, CATO INSTITUTE, Washington, D.C., for Amici Curiae. **ON BRIEF:** Anne McClorey McLaughlin, ROSATI, SCHULTZ, JOPPICH & AMTSBUECHLER, P.C., Farmington Hills, Michigan, for Appellant/Cross-Appellee. Chance Weldon, Robert Henneke, Theodore Hadzi-Antich, TEXAS PUBLIC POLICY FOUNDATION, Austin, Texas, Michael J. Pattwell, CLARK HILL PLC, Lansing, Michigan, for Appellee/Cross-Appellant. Richard K. Norton, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, Sean Hammond, MICHIGAN ENVIRONMENTAL COUNCIL, Lansing, Michigan, Ilya Shapiro, CATO INSTITUTE, Washington, D.C., Robert E. Thall, BAUCKHAM, SPARKS, THALL, SEEBER & KAUFMAN, P.C., Portage, Michigan, Kathryn D. Valois, PACIFIC LEGAL FOUNDATION, Palm Beach Gardens, Florida, Kimberly S. Hermann, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, Braden Boucek, THE BEACON CENTER OF

TENNESSEE, Nashville, Tennessee, Brian K. Kelsey, LIBERTY JUSTICE CENTER, Chicago, Illinois, for Amici Curiae.

_____

**OPINION**

_____

JOHN K. BUSH, Circuit Judge.  American history teems with stories and myths of trees. Johnny Appleseed's apple trees and George Washington's cherry tree are but a few of those timber tales that inspire and teach.  Whether to plant or cut down a tree can be, for better or worse, an individual choice.  But sometimes the government gets involved.  For example, it can reward those who plant, *see, e.g.*, Timber Culture Act of 1873, ch. 277, 17 Stat. 605 (granting additional land to homesteaders who planted seedlings), or compensate for land taken to conserve, *see, e.g.,* Migratory Bird Conservation Act of 1929, 16 U.S.C. § 715 *et seq.*  Those "carrot" measures serve to further the public interest in tree cultivation and management while compensating private parties for their property and efforts.

Here, however, the government used what F.P. Development portrays as the "stick" approach.  Intending to help preserve its greenery, the Charter Township of Canton, Michigan, passed an ordinance that prohibits F.P. from removing certain trees on its land without a permit and requires F.P. to mitigate the removal.  F.P. challenges the regulation, claiming that it constitutes a taking of its property without just compensation, an unreasonable seizure, and an excessive fine.  The district court granted summary judgment to F.P. on the takings claim and to Canton on the others.  We affirm.

I.

Around July 2006, Canton passed an ordinance, which the parties refer to as the Tree Ordinance, addressing forest preservation and tree clearing.  The township's aim was to improve its community and protect its natural resources.  Accordingly, the Tree Ordinance requires tree owners in Canton to get a permit before removing certain trees or undergrowth from their properties.  Specifically, the ordinance deals with four categories of tree-related clearing.  It prohibits the unpermitted removal, damage, or destruction of (1) any tree with a diameter at

breast height of six inches or greater, (2) any landmark or historic tree,[1] (3) any tree located within a forest and with a diameter at breast height of three inches or more, and (4) any under-canopy vegetation within the dripline of a forest. There are, however, numerous exceptions. For example, agricultural and farming operations, commercial nurseries, tree farms, and occupied lots of fewer than two acres are not subject to the permitting requirement.

The unlucky tree owner who does not fall into one of those exceptions has to submit a tree-removal-permit application to Canton before commissioning an arborist. Among other requirements, the application must describe the area affected by the tree removal, each tree to be removed and its location, and what the affected area will look like after the proposed removal. The ordinance also lists review procedures and standards that Canton must follow when reviewing applications. Those procedures require the township to evaluate the effect of the proposed development on the quality of the surrounding area.

If Canton issues a permit, a tree owner must agree to mitigate the tree removal. The Tree Ordinance lists three standardized mitigation options: a tree owner can replace removed trees on its own property, replace them on someone else's property, or pay a designated amount into Canton's tree fund so the township can replace them elsewhere. For every landmark tree cut down, a tree owner must replant three trees or pay about $450 into the tree fund. For every non-landmark tree cut down as part of a larger-scale tree removal, a tree owner must replant one tree or pay about $300 into the tree fund. If a tree owner fails to comply with those requirements, Canton sends a notice of violation and requires that the tree owner submit a permit application or face an enforcement lawsuit.[2]

F.P. Development, a real-estate holding company owned by Martin F. Powelson, is one of those non-complying tree owners. In 2007, F.P. purchased a 62-acre parcel of undeveloped land from Canton for $550,000. The plan was to use the land to expand Powelson's traffic-

---

[1]A "landmark" or "historic" tree means "any tree which stands apart from neighboring trees by size, form or species, as specified in the [township's] landmark tree list . . . or any tree, except box elder, catalpa, poplar, silver maple, tree of heaven, elm or willow, which has a [diameter at breast height] of 24 inches or more."

[2]Canton also has the authority to impose criminal penalties on violators in the form of a $500 fine and up to 90 days' imprisonment.

control sign business, POCO, which occupied the lot adjacent to the 62-acre parcel. F.P. left the land undeveloped until 2016, when it filed a property split application with Canton, requesting permission to split 44 acres of the property roughly in two: a 28-acre plot for F.P. to keep and a 16-acre plot to sell. Canton tentatively approved the separation and noted that any development involving tree removal would require the proper permitting. By 2017, F.P. completed the split.

But, unfortunately for F.P., the two parcels were bisected by a county drainage ditch that had become clogged with fallen trees and other debris. After the county refused to clear the ditch, F.P. contracted with a timber company to remove the trees and debris and to clear several other trees from the property. As to that removal, F.P. did not apply for or receive a permit. Nor did it receive permission from Canton to proceed without a permit.

Soon after, someone tipped off Canton's Landscape Architect and Planner to F.P.'s unpermitted tree removal. The township investigated and confirmed the tip. It then posted a "Stop Work" order on F.P.'s property and issued a "Notice of Violation." The notice made clear that a survey of the property was required to determine the number and species of trees removed so that Canton could enforce the Tree Ordinance.

From that survey, Canton determined that F.P. had removed 159 trees—14 landmark trees and 145 non-landmark trees. To comply with the ordinance, F.P. had to either replant 187 trees (three for every landmark tree removed and one for every non-landmark tree) on its or another's property or deposit $47,898 into Canton's tree fund.

F.P. chose neither option. Instead, it filed a lawsuit, seeking declaratory and injunctive relief under 42 U.S.C. § 1983. It claimed that Canton's Tree Ordinance constituted (1) a facial and as-applied unconstitutional taking, in violation of the Fifth and Fourteenth Amendments; (2) an unreasonable seizure, in violation of the Fourth and Fourteenth Amendments; and (3) an excessive fine, in violation of the Eighth and Fourteenth Amendments. The Township filed a counterclaim seeking $47,898 in damages.

After several months of discovery, F.P. moved for summary judgment. Canton moved to dismiss the case on ripeness grounds, for judgment on the pleadings, or for summary judgment in its favor. The district court denied Canton's motion to dismiss on ripeness grounds. The court

then granted F.P. summary judgment on its as-applied Fifth Amendment claim.  It reasoned that although the ordinance, as applied to F.P., was not unconstitutional as a per se physical taking, it was unconstitutional as a regulatory taking and as an unconstitutional condition.  The court did not decide F.P.'s facial challenge.  Finally, the court granted Canton summary judgment on F.P.'s Fourth and Eighth Amendment claims.  Both parties appeal.

## II.

We review a district court's decision on summary judgment de novo.  *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Jackson*, 925 F.3d at 806.

## III.

### A.  RIPENESS

We begin with the questions about our jurisdiction.  The doctrine of ripeness prevents courts from deciding cases or controversies prematurely.  *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).  It is "drawn both from Article III limitations on judicial power and from prudential" concerns.  *Id.* at 808 (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)).  Issues of ripeness rooted in Article III are jurisdictional; those based on prudence are not.  *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012–13 (1992).

Amici Michigan Township Association and Michigan Municipal League argue on appeal that F.P.'s as-applied challenge to the Canton Tree Ordinance is not ripe for review, citing prudential ripeness concerns.  But Canton did not raise those concerns in its briefing before us.  So the argument is forfeited.  *See Self-Ins. Inst. of Am., Inc. v. Snyder*, 761 F.3d 631, 641 (6th Cir. 2014) ("[W]hile an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties."  (quoting *Cellnet*

*Commc'ns Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998))); *see also Stolt-Nielsen*, 559 U.S. at 670 n.2 (holding that a prudential ripeness argument was waived).

What's more, "we do not think it prudent to apply" the doctrine of prudential ripeness sua sponte here. F.P. has standing under Article III, and the status of the prudential ripeness doctrine is uncertain. *See Lucas*, 505 U.S. at 1013; *see also, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–27 (2014) (questioning the vitality of the doctrine of prudential ripeness); *Miller v. City of Wickliffe*, 852 F.3d 497, 503 & n.2 (6th Cir. 2017) (declining to address prudential ripeness because plaintiff lacked standing under Article III and because of the questioned vitality of the doctrine). We thus proceed to the merits.

   B.  TAKING WITHOUT JUST COMPENSATION

F.P.'s first claim is that Canton's Tree Ordinance constitutes a taking of its trees in violation of the Takings Clause of the Fifth Amendment, as incorporated by the Fourteenth Amendment. The Takings Clause states that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. In F.P.'s view, Canton's Ordinance violates that prohibition in three ways: the ordinance imposes (1) a per se taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) and *Horne v. Department of Agriculture*, 576 U.S. 350 (2015); (2) a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978); and (3) an unconstitutional condition under *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 570 U.S. 595, 604 (2013). For reasons discussed below, we agree with F.P. that the ordinance violates the Fifth Amendment, through the Fourteenth Amendment, based on the unconstitutional-conditions doctrine, so we need not consider the other two theories for relief. *See Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 575 n.6 (9th Cir. 2020); *Phillip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 n.4 (1st Cir. 1998). Before addressing pertinent legal issues below, however, we provide some background on what began as a highly contentious subject in American history.

1. Historical Background

On April 13, 1772, almost two years before the Boston Tea Party, and three years before an American Patriot fired the shot heard 'round the world, a group of colonists revolted against the Crown's longstanding Pine Tree Act. The act prohibited colonists from cutting down white pine trees on their own land without first obtaining a royal license and subjected violators to fines that grew with the size of the tree felled. *See* An Act Giving Further Encouragement for the Importation of Naval Stores, and for the Purposes Therein Mentioned, 1721, 5 Geo I., c. 12 (Eng.). The colonists ignored the act, and a large group of disgruntled tree owners captured the British representatives, beat them with switches (one lashing for every tree the Crown claimed), maimed and shaved their horses, and ran them out of town. *See* William Little, *History of Weare, New Hampshire 1735–1888*, 189 (S.W. Huse & Co., 1888).

F.P. suggests that the Founders adopted and ratified the Takings Clause of the Fifth Amendment, in part, to prevent the type of tree restrictions imposed by both the British Crown and the Township of Canton. It is true that "[t]he Founders recognized that the protection of private property [would be] indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). So, as part of the Bill of Rights, they included the Takings Clause in the Fifth Amendment. But that constitutional guarantee does not, as a matter of original meaning, obviously invalidate Canton's property regulation.

Indeed, history presents a more complicated picture of land-use regulation in the Founding Era than F.P. suggests. The Takings Clause may not have even extended to regulations of private property like the one at issue in this case. *See id.* at 2071 (noting that the Takings Clause was originally "limited to physical appropriations of property"). In fact, despite the early colonists' frustration with the Crown's Pine Tree Act, general land regulation was commonplace in colonial America. *See* Act of May 12, 1724, 7 The Public Records of the Colony of Connecticut 10 (Charles J. Hoadly ed., Hartford, Conn. Cass, Lockwood & Brainard Co. 1876) (requiring removal of barberry bushes to prevent wheat blight).[3] Indeed, the author of

---

[3]*See also, e.g.*, Ordinance of Feb. 23, 1656, Laws and Ordinances of New Netherland, 1638–1674, 361, 361 (E.B. O'Callaghan, trans., Albany, N.Y., Weed, Parsons and Co. 1868) (requiring installation of fences to support the "cultivation of the soil"); Act of Nov. 27, 1700, ch. LIII, sec. III, 2 The Statutes at Large of Pennsylvania

the Takings Clause, James Madison, seemed to view the constitutional text as limiting only the government's power to take property physically for public use.  *See* James Madison, *Property*, Nat'l Gazette, Mar. 27, 1792, in 14 The Papers of James Madison, 266–68 (Robert A. Rutland et al. eds., 1983) (invoking the Takings Clause and distinguishing between "direct" and "indirect[]" violations of property).  Madison's interpretation finds support in common law and statutes that allowed certain government land-use regulations without requiring compensation to other land owners.  *See* 1 *Blackstone's Commentaries* editor's app., 305–06 (St. George Tucker ed., Philadelphia, Birch & Small 1803).[4]

Of course, questions abound regarding whether the ratification of the Fourteenth Amendment placed greater limits on state-government regulation of private property than did the Fifth Amendment.  *See, e.g.*, *Murr v. Wisconsin*, 137 S. Ct. 1933, 1957 (2017) (Thomas, J. dissenting).  But, as a court of middle management, we have no occasion or authority to answer those questions here.  Regardless, the Supreme Court made clear in 1922 that the rights guaranteed by the Takings Clause of the Fifth Amendment, as applied to the states through the Fourteenth Amendment, limit all regulations of private property that go "too far."  *See Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  And later, the Court held that certain permitting schemes should be subject to analysis under the unconstitutional-conditions doctrine.  *See Nollan*, 483 U.S. at 835–37; *Dolan*, 512 U.S. at 386–88; *Koontz*, 570 U.S. at 604.  Our analysis begins and ends there.[5]

2.  Unconstitutional Conditions

Under the unconstitutional-conditions doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right."  *Koontz*, 570 U.S. at 604 (quoting *Regan*

---

65, 66–67 (James T. Mitchell & Harry Flanders eds., Pa., Clarence M. Busch 1896) (requiring planting and maintenance of certain trees).

[4]*See also, e.g.*, Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings but the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 736 (2008); *see generally* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 798–859 (1995).

[5]The briefing on appeal concluded before the Supreme Court issued its opinion in *Cedar Point Nursery*— the Court's most recent case involving the Takings Clause.  141 S. Ct. at 2063.  But nothing in that case demands that we review F.P.'s challenge to Canton's ordinance under a per se or regulatory takings approach.

*v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983)).  In practice, the doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.*

F.P. argues that Canton's Tree Ordinance places an unconstitutional condition on its Fifth Amendment rights by coercing it into giving up its right to just compensation for the township's taking of trees in exchange for a permit.  As noted, F.P. points to *Nollan*, *Dolan*, and *Koontz* for support.

Those cases "'involve a special application' of" the unconstitutional-conditions doctrine "that protects the Fifth Amendment right to just compensation" when the government demands property in exchange for land-use permits.  *Koontz*, 570 U.S. at 604 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 547 (2005)).  In particular, they hold that "the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Id.* at 606.

There is an interesting question whether Canton's application of the Tree Ordinance to F.P. falls into the category of government action covered by *Nollan*, *Dolan*, and *Koontz*.  But the parties do not raise it.  And we decline to do so on our own accord.  So we proceed, as the parties request, and apply the essential nexus and rough proportionality test provided in those cases.

### 3.  Essential Nexus and Rough Proportionality

The parties agree that there is an "essential nexus" between Canton's "legitimate" interest in forest and natural resource preservation and the permit conditions.  *See Dolan*, 512 U.S. at 386.  Therefore, we need only address the "rough proportionality" prong of *Nollan* and *Dolan*.

That prong "requires us to determine whether the degree of the exactions demanded by the [township's] permit conditions bears the required relationship to the projected impact of [F.P.'s] proposed development." *Dolan*, 512 U.S. at 388.  The "required relationship" does not have to be "exacting," but it cannot be "generalized." *Id.* at 389–90.  It must be "rough[ly] proportional[]." *Id.* at 391.  Of course, "[n]o precise mathematical calculation is required, but the

[township] must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.*

Canton fails to carry its burden to show that it made the required individualized determination. Under the Tree Ordinance, F.P. must replant one tree for every non-landmark tree removed and three trees for every felled landmark tree. The township also requires F.P. to bear the associated costs, whether F.P. does the replanting and relocation itself or outsources the task to the township. Of course, Canton's mitigation options could offset F.P.'s tree removal, and they arguably involve some individualized assessment given that Canton must determine the number and type of trees cut. But *Dolan* requires more.

In *Dolan*, the government argued that its exaction of an easement for a bicycle pathway was necessary to reduce traffic congestion that the property owner's proposed development might cause. 512 U.S. at 395. The Court held that the government's assertion that the conditioned path "'*could* offset some of the traffic demand' is a far cry from a finding that the bicycle pathway system *will*, or is *likely to*, offset some of the traffic demand." *Id.* (quoting *Dolan v. City of Tigard*, 845 P.2d 437, 447 (Ore. 1993) (en banc) (Peterson, J., dissenting)). Here, the township provides us with little information about its replacement or relocation requirements. Like the government in *Dolan*, it seems to assume that its mitigation requirements are appropriate. And the information it presents concerning the amount of money F.P. must spend to satisfy those requirements is based on tree replacement costs calculated fifteen years ago, in 2006. That limited and arguably stale information does not suffice.

Canton has pointed to nothing indicating, for example, that F.P.'s tree removal effects a certain level of environmental degradation on the surrounding area. Nor does it demonstrate whether it considered that F.P.'s clearing of the clogged ditch on its property or its removal of dead trees may have improved the surrounding environment. The only evidence on that point suggests that even if F.P. offset its tree removal in a manner not contemplated by the township, Canton would still demand its pre-set mitigation. At bottom, Canton's support fails to get it over the bar set by *Nollan* and *Dolan*. *See id.* at 395–96 (noting that "the city must make some effort to quantify its findings in support" of its exactions); *see also Goss v. City of Little Rock*, 151 F.3d 861, 863 (8th Cir. 1998) (holding that local traffic mitigation requirements did not satisfy

*Dolan*'s rough-proportionality test because they were based on pre-set assumptions, rather than an individualized impact assessment).

That a representative from Canton went to F.P.'s property to count and categorize the trees F.P. cut down does not alter our conclusion. And the "individualized assessment" that Canton points to in the ordinance relates to the initial review of a permit application, not to the proportionality of the mitigation requirements. *See* Canton Code of Ordinances Art. § 5A.05(F). According to Canton's own representative, F.P.'s removal of regulated trees triggers the mitigation requirements, regardless of the specific impact caused by their removal. Canton has not made the necessary individualized determination here.

Finally, our conclusion accords with analogous decisions handed down by state courts. *See Dolan*, 512 U.S. at 389 (recognizing the importance of state court decisions in this context given that they have dealt with the question "a good deal longer than we have").

For example, in *Mira Mar Development Corp. v. City of Coppell*, a state court in Texas similarly concluded that the government's lack of evidence sank its ability to demonstrate rough proportionality. 421 S.W.3d 74, 95–96 (Tex. Ct. App. 2013). There, a property owner applied to the City of Coppell for a development permit. *Id.* at 95. Like Canton, the city in part conditioned its granting of the permit on the owner's agreeing to pay thousands of dollars in "tree mitigation fees" for trees it planned to remove from its property. *Id.* The Texas court first determined that the fees were exactions subject to the nexus and rough proportionality requirements of *Nollan* and *Dolan*. *Id.* Then, it noted the government's lack of evidence to support a finding of rough proportionality: the city did "not show that the removal of trees in the development would harm the air quality, increase noise and glare, remove ecosystems, bring down property values, or reduce the other benefits of trees described in the ordinance." *Id.* at 96. As we do here, the Texas court held that, based on the record before it, the ordinance could not meet the evidentiary bar set for rough proportionality in *Dolan*. *Id.*; *see also, e.g.*, *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 644–45 (Tex. 2004) (holding that the Town's monetary exaction was not roughly proportional because the rationale for it was too abstract and because the town provided no real evidence of impact).

In other state court cases, like those the Supreme Court cited positively in *Koontz*, the government generally satisfies the nexus and rough proportionality test with ease by introducing some evidence relating to the "methodology and functioning" of its exactions. *See, e.g.*, *Home Builders Ass'n of Dayton & the Miami Valley v. Beavercreek*, 729 N.E.2d 349, 357–59 (Ohio 2000); *see also, e.g.*, *Sparks v. Douglas Cnty.*, 904 P.2d 738, 745 (Wash. 1995) ("In this case, the findings made by the County were more than mere conclusory statements of general impact."); *Hallmark Inns & Resorts, Inc. v. City of Lake Oswego*, 88 P.3d 284, 291 (Or. Ct. App. 2004) (same). That is not the case here. On the record before us, Canton's Tree Ordinance, as applied to F.P., fails rough proportionality and is thus an unconstitutional condition under *Nollan*, *Dolan*, and *Koontz*.

## C. UNREASONABLE SEIZURE

F.P.'s next claim involves the same trees, but a different right. The Fourth Amendment, as incorporated through the Fourteenth, preserves the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[F]rom the time of the founding to the present," when speaking of property, "the word 'seizure' has meant a 'taking possession.'" *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 624 (1991)). So, "a 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Fox v. Van Oosterum*, 176 F.3d 342, 350 (6th Cir. 1999) (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)).

F.P. argues that the Tree Ordinance meaningfully interferes with its possessory interest in its trees and is therefore an unreasonable seizure. But the ordinance here does not enable Canton to take actual possession of F.P.'s trees. Nor does it meaningly interfere with F.P.'s possession of its trees. F.P. was able to sell its trees to the timber company that removed them. In short, F.P. has full control over the trees it removes from its property. Canton therefore has not seized them.

The most that can be said of the ordinance in this context is that it might interfere with F.P.'s control over some of its standing trees by limiting its ability to cut them down. But that does not mean that the ordinance should be subject to Fourth Amendment scrutiny.

The ordinance requires a permit for F.P.'s removal of its standing trees—real property, not located on or anywhere near a house or its curtilage. *See Kerschensteiner v. N. Mich. Land Co.*, 221 N.W. 322, 327 (Mich. 1928) ("Standing timber is real estate. It is a part of the realty the same as the soil from which it grows."). And the trees themselves are obviously not houses, persons, or papers. So the trees, if they are covered by the Fourth Amendment, must be effects. But the Supreme Court has told us that real property is not an "effect" within the meaning of the Fourth Amendment. *Oliver v. United States*, 466 U.S. 170, 177 n.7 (1984) ("The Framers would have understood the term 'effects' to be limited to personal, rather than real, property."); *see also Soldal*, 506 U.S. at 62 n.7 ("[T]he [Fourth] Amendment does not protect possessory interests in all kinds of property."). Therefore, as applied to F.P., Canton's Tree Ordinance is not subject to the limitations of the Fourth Amendment.

D.  EXCESSIVE FINE

In its final claim, F.P. looks to the Eighth Amendment. The Excessive Fines Clause of that Amendment, as applied to localities through the Fourteenth, dictates that "excessive fines" shall not be "imposed." U.S. Const. amend. VIII. As is clear from its language, the clause "limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.'" *Austin v. United States*, 509 U.S. 602, 609–10 (1993) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)). It guards only "against abuses of [the] government's punitive or criminal-law-enforcement authority." *Timbs v. Indiana*, 139 S. Ct. 682, 686 (2019). So a monetary demand that is retributive or deterrent and thus intended to punish, even in part, is subject to the limitations of the Excessive Fines Clause. *Austin*, 509 U.S. at 621 (quoting *United States v. Ward*, 448 U.S. 242, 254 (1980)). But a demand that is related only to "damages sustained by society or to the cost of enforcing the law," and thus wholly remedial, is not. *Ward*, 448 U.S. at 254.

F.P. argues that the ordinance violates the Excessive Fines Clause because Canton's demand for payment in accordance with the Tree Ordinance is punishment that is grossly disproportionate to its tree removal. But that law is designed to remedy the harm that removing trees causes, and it purports to estimate the monetary demands it makes based on the cost it expects to incur replacing them. That purpose is remedial, not punitive, so it does not implicate the Eighth Amendment.[6]

IV.

Canton's Tree Ordinance, as applied to F.P., is not an unreasonable seizure or an excessive fine. But it does represent an unconstitutional taking. Accordingly, we affirm.

---

[6]There is a form of punishment under Michigan law for F.P.'s violation of the ordinance: a $500 fine and up to 90 days' imprisonment. But Canton has not levied that fine, nor has it attempted to arrest any representative of F.P. And F.P. does not challenge either of those penalties.